JOHN E. MCCONNELL ET AL. *v.* BEVERLY
ENTERPRISES-CONNECTICUT, INC., ET AL.
(13477)
(13478)
(13479)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and COVELLO, Js.

Argued November 9, 1988—decision released January 31, 1989

*Richard J. Lynch,* assistant attorney general, with whom were *Henry A. Salton,* assistant attorney general, and, on the brief, *Joseph I. Lieberman,* attorney general, and *Robert E. Walsh,* assistant attorney general, for the appellants in the first appeal (defendant attorney general, defendant commissioner of health services, and defendant chief medical examiner).

*Susann E. Gill,* assistant state's attorney, with whom, on the brief, were *John J. Kelly,* chief state's attorney, and *Steven M. Sellers,* assistant state's attorney, for the appellant in the second appeal (defendant state's attorney for the judicial district of Danbury).

*Jerome A. Mayer,* with whom was *James M. Mannion,* for the appellant in the third appeal (defendant guardian ad litem).

*Steven A. Wise,* with whom was *Fenella Rouse,* for the appellees (plaintiffs).

*Ruth L. Pulda* and *Susan Price-Livingston* filed a brief for the Connecticut Civil Liberties Union Foundation et al. as amici curiae.

*Christopher J. Smith* and *James Michael Thunder* filed a brief for the Committee to Protect the Rights of the Medically Dependent and Disabled et al. as amici curiae.

*Emanuel Margolis, Fenella Rouse, Elena N. Cohen, M. Rose Gasner* and *Richard Wasserman* filed a brief for the Society for the Right to Die, Inc., as amicus curiae.

*Lawrence W. Berliner,* senior staff attorney, filed a brief for the Office of Protection and Advocacy for Handicapped and Developmentally Disabled Persons as amicus curiae.

*Giles R. Scofield III, Hilary Fisher Nelson* and *Sheila Taub* filed a brief for the Concern for Dying as amicus curiae.

*Andrew O'Neill, James Bopp, Jr., Mary M. Nimz, Daniel Avila* and *Teresa Kealy* filed a brief for the Ethics and Advocacy Task Force of the Nursing Home Action Group as amicus curiae.

PETERS, C. J. This case concerns the right of a family, on behalf of a patient who is presently in a terminal coma, to implement the patient's clearly expressed wish for the removal of a gastrostomy tube that is artificially providing nutrition and hydration for the patient. The plaintiffs, John E. McConnell, Kathleen A. McConnell, James M. McConnell and Amy L. McConnell, brought an action seeking injunctive and declaratory relief from the life support services being provided to Carol M. McConnell by a private nursing home, the defendants Beverly Enterprises-Connecticut, Inc., doing business as Danbury Pavilion Healthcare, and John Horstman, the Pavilion's administrator. Other named defendants are the attorney general, the state's attorney for the judicial district of Danbury, the attorney appointed as guardian ad litem for Carol McConnell, the commissioner of health services for the state of Connecticut, and the chief medical examiner for the state of Connecticut. The trial court, after a hearing, found the issues for the plaintiffs and rendered judgment accordingly. Separate appeals have been taken by the attorney general, on his own behalf and on behalf of the defendant state officials, by the state's attorney, and by the guardian ad litem.[1] We find no error.

Many of the underlying facts reported in the trial court's memorandum of decision are undisputed. Carol McConnell is the fifty-seven year old wife of the plaintiff John E. McConnell and the mother of the three other coplaintiffs. By profession, she is a registered nurse. Her last nursing positions were as head nurse and manager of the emergency room at Danbury Hospital.

[1] Danbury Pavilion Healthcare has not appealed.

On January 18, 1985, Mrs. McConnell sustained a severe head injury as the result of an automobile accident. She has never regained consciousness, despite excellent medical care, first at Danbury Hospital, then at the Greenery Rehabilitation Hospital in Boston, and, since July of 1986, at the defendant Danbury Pavilion. She is in an irreversible persistent vegetative state; there is no prospect of improvement. In the opinion of her attending physician, Dr. Robert L. Ruxin, her condition is terminal, and the trial court so found. Her life is presently sustained by means of a gastrostomy tube through which she receives nutrition and hydration.

The trial court made a further finding, challenged on appeal, that prior to her accident, Mrs. McConnell had clearly and knowingly expressed her wishes about her treatment, were she ever to be in a permanent vegetative state. The court found that, because of her professional training and experience, Mrs. McConnell understood the status of patients with traumatic brain damage and was fully familiar with all forms of life-sustaining equipment, including respirators and gastrostomy tubes. She had, in fact, expressly and repeatedly told her family and her co-workers that, in the event of her permanent total incapacity, she did not want to be kept alive by any artificial means, including life-sustaining feeding tubes.

On the basis of these findings, the trial court concluded that the plaintiffs had proven a common law right to self-determination, supported by a constitutional right to privacy, under which they were entitled to the relief they sought. The court held that this common law right coexists with the provisions of General Statutes §§ 19a-570 through 19a-575, by which the legislature authorized the removal of life support systems under statutorily specified circumstances. Both of these legal rulings are challenged on appeal. If, however, the statute itself affords the plaintiffs the relief

they seek in this case, we need not reach the issue of the statute's arguable exclusivity.[2] In addition, the defendants challenge the evidentiary support for the trial court's factual findings.

## I

Before we reach the merits of the plaintiffs' claims for relief, we must consider whether the trial court had the requisite subject matter jurisdiction to entertain them. The defendant attorney general raised at trial the claim that John E. McConnell, as conservator for his wife, had an obligation first to seek permission from the Probate Court for the withdrawal of the gastrostomy tube from Mrs. McConnell. The trial court rejected this argument, which the attorney general renews on appeal. We agree with the trial court.

Independent equitable actions are properly brought in the Superior Court as a general court of equity jurisdiction. *Palmer* v. *Hartford National Bank & Trust Co.,* 160 Conn. 415, 433, 279 A.2d 726 (1971). While probate courts are courts of equity as well as of law; *Donovan's Appeal from Probate,* 41 Conn. 551, 559 (1874); " '[a] Probate Court judge is not a chancellor. His only equity powers are those which are incidental to, and connected with, the settlement of a particular estate.' " *Marcus' Appeal from Probate,* 199 Conn. 524, 529, 509 A.2d 1 (1986), quoting *Palmer* v. *Hartford National Bank & Trust Co.,* supra, 429. The legislature has endowed the Superior Court and not the Probate Court with general equitable powers; General Statutes § 52-1;[3] and specifically with the power to issue

---

[2] Although the trial court decided that judgment for the plaintiffs was, in the alternative, also warranted on a theory of substituted judgment, it is not necessary for us to review that holding in the circumstances of the present case.

[3] General Statutes § 52-1 provides in pertinent part: "The superior court may administer legal and equitable rights and apply legal and equitable remedies in favor of either party in one and the same civil action so that legal and equitable rights of the parties may be enforced and protected in one action."

declaratory judgments. General Statutes § 52-29 (a).[4] Furthermore, the "Probate Court may not adjudicate complex legal questions which are subject to the broad jurisdiction of a general court of equity. . . . Thus, the Probate Court lacks essential powers necessary to handle independent equitable actions . . . . " *Palmer v. Hartford National Bank & Trust Co.,* supra, 430; see also *Ramsdell* v. *Union Trust Co.,* 202 Conn. 57, 73, 519 A.2d 1185 (1987); *Carten* v. *Carten,* 153 Conn. 603, 615, 219 A.2d 711 (1966).

The instant action is of a declaratory nature and poses complex constitutional and statutory questions. Thus, we conclude that the trial court did not err in finding that it had "the power to decide this case and rule on the relief requested in [the] absence of prior probate court consideration."

## II

We turn next to the terms of the Removal of Life Support Systems Act, General Statutes §§ 19a-570 to 19a-575;[5] in which the legislature, cognizant of a common law right of self-determination and of a constitu-

---

[4] General Statutes § 52-29 (a) provides: "The superior court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed. The declaration shall have the force of a final judgment."

[5] For present purposes, the relevant sections of the Removal of Life Support Systems Act are §§ 19a-570, 19a-571, 19a-572 and 19a-573. These sections provide as follows:

"Sec. 19a-570. DEFINITIONS. For purposes of this section and sections 19a-571 to 19a-575, inclusive:

" (1) 'Life support system' means any mechanical or electronic device, excluding the provision of nutrition and hydration, utilized by any physician or licensed medical facility in order to replace, assist or supplement the function of any human vital organ or combination of organs and which prolongs the dying process;

"(2) 'Beneficial medical treatment' includes the use of surgery, treatment, medication and the utilization of artificial technology to sustain life;

"(3) 'Terminal condition' means the final stage of an incurable or irre-

tional right to privacy, sought to provide a statutory mechanism to implement these important rights. We must decide what role this act plays in the present litigation. The trial court held that the plaintiffs were entitled to relief without regard to the act, which the court construed to be nonexclusive. The defendants, by contrast, maintain that the act governs and precludes the relief sought by the plaintiffs. There is, however, a middle ground, a construction of the act that is consistent with the plaintiffs' affirmative claims for relief.

## A

Although the United States constitution does not expressly provide a right to privacy, the United States

versible medical condition which, in the opinion of the attending physician, will result in death."

"Sec. 19a-571. LIABILITY RE REMOVAL OF LIFE SUPPORT SYSTEM OF INCOMPETENT PATIENT. ATTENDING PHYSICIAN MUST OBTAIN CONSENT OF NEXT OF KIN. CONSIDERATION OF WISHES OF PATIENT. DOCUMENT AS EXPRESSION OF WISHES. Any physician licensed under chapter 370 or any licensed medical facility which removes or causes the removal of a life support system of an incompetent patient shall not be liable for damages in any civil action or subject to prosecution in any criminal proceeding for such removal, provided (1) the decision to remove such life support system is based on the best medical judgment of the attending physician; (2) the attending physician deems the patient to be in a terminal condition; (3) the attending physician has obtained the informed consent of the next of kin, if known, or legal guardian, if any, of the patient prior to removal; and (4) the attending physician has considered the patient's wishes as expressed by the patient directly, through his next of kin or legal guardian, or in the form of a document executed in accordance with section 19a-575, if any such document is presented to, or in the possession of, the attending physician at the time the decision to terminate a life support system is made. If the attending physician does not deem the patient to be in a terminal condition, beneficial medical treatment and nutrition and hydration must be provided."

"Sec. 19a-572. FAILURE TO EXECUTE DOCUMENT CREATES NO PRESUMPTION RE WISHES OF PATIENT. Sections 19a-571 and 19a-573 to 19a-575, inclusive, create no presumption concerning the wishes of a patient who has not executed a document as described in section 19a-575."

"Sec. 19a-573. COMFORT CARE AND PAIN ALLEVIATION TO BE PROVIDED. Notwithstanding the provisions of sections 19a-571, 19a-572, 19a-574 and 19a-575, comfort care and pain alleviation shall be provided in all cases."

Supreme Court has recognized a right to privacy in the penumbra of the Bill of Rights, specifically in the protections of the first, third, fourth and fifth amendments. *Griswold* v. *Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965). "[T]he Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." *Roe* v. *Wade*, 410 U.S. 113, 152, 93 S. Ct. 705, 35 L. Ed. 2d 147, reh. denied, 410 U.S. 959, S. Ct. 1409, 35 L. Ed. 2d 694 (1973). Justice Brandeis has referred to this right as "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead* v. *United States*, 277 U.S. 438, 478, 48 S. Ct. 564, 72 L. Ed. 944 (1928) (Brandeis, J., dissenting). Although the court has recently construed this right to privacy narrowly; *Bowers* v. *Hardwick*, 478 U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140, reh. denied, 478 U.S. 1039, 107 S. Ct. 29, 92 L. Ed. 2d 779 (1986); it has held that personal rights that are "implicit in the concept of ordered liberty"; id., 191, quoting *Palko* v. *Connecticut*, 302 U.S. 319, 325–26, 58 S. Ct. 149, 82 L. Ed. 288 (1937); or "deeply rooted in this Nation's history and tradition" are included in this guarantee of personal privacy. *Bowers* v. *Hardwick*, supra, 192, quoting *Moore* v. *East Cleveland*, 431 U.S. 494, 503, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977). The court has found that contraception,[6] procreation,[7] marriage[8] and education[9] implicate privacy rights.

---

[6] *Eisenstadt* v. *Baird*, 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972); *Griswold* v. *Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965).

[7] *Roe* v. *Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147, reh. denied, 410 U.S. 959, 93 S. Ct. 1409, 35 L. Ed. 2d 694 (1973); *Skinner* v. *Oklahoma*, 316 U.S. 535, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942).

[8] *Loving* v. *Virginia*, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967).

[9] *Wisconsin* v. *Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972); *Pierce* v. *Society of Sisters*, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925).

The right to refuse medical treatment is a right rooted in this nation's fundamental legal tradition of self-determination. In 1891, for example, the United States Supreme Court stated, "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pacific Railway Co.* v. *Botsford,* 141 U.S. 250, 251, 11 S. Ct. 1000, 35 L. Ed. 734 (1891) (court cannot order plaintiff to undergo surgical examination). Additionally, although the United States Supreme Court has not yet addressed the issue, the Fourth Circuit Court of Appeals has stated, "[t]he right to be free of unwanted physical invasions has been recognized as an integral part of the individual's constitutional freedoms, whether termed a liberty interest protected by the Due Process Clause, or an aspect of the right to privacy contained in the notions of personal freedom which underwrote the Bill of Rights. The right to refuse medical treatment has been specifically recognized as a subject of constitutional protection." *United States* v. *Charters,* 829 F.2d 479, 491 (4th Cir. 1987) (right to refuse antipsychotic medication).

This court has also long held that " '[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body . . . .' " *Schmeltz* v. *Tracy,* 119 Conn. 492, 495–96, 177 A. 520 (1935) (surgery without consent is legally an assault), quoting *Schloendorff* v. *New York Hospital,* 211 N.Y. 125, 129, 105 N.E. 92 (1914), overruled on other grounds. We relied on *Schmeltz* in the recent case of *Logan* v. *Greenwich Hospital,* 191 Conn. 282, 288–89, 465 A.2d 294 (1983) (no duty to warn of more hazardous surgical alternatives).

Court after court has recognized the existence of a right, in principle and in properly guarded circumstances, to the removal of medical treatments that artificially prolong life. *Bouvia* v. *Superior Court,* 179 Cal. App. 3d 1127, 1137, 225 Cal. Rptr. 297 (1986) ("The right to refuse medical teatment is basic and fundamental. . . . It is recognized as a part of the right of privacy protected by both the state and federal constitutions."); *Brophy* v. *New England Sinai Hospital, Inc.,* 398 Mass. 417, 430, 497 N.E.2d 626 (1986) ("The right of a patient to refuse medical treatment arises both from the common law and the unwritten and penumbral constitutional right to privacy."); *In re Quinlan,* 70 N.J. 10, 40, 355 A.2d 647, cert. denied sub nom. *Garger* v. *New Jersey,* 429 U.S. 992, 97 S. Ct. 319, 50 L. Ed. 2d 289 (1976) ("Presumably [the right of personal privacy recognized by the United States Supreme Court in *Griswold* v. *Connecticut,* supra,] is broad enough to encompass a patient's decision to decline medical treatment under certain circumstances"); see also *Gray* v. *Romeo,* 697 F. Sup. 580, 586 (D.R.I. 1988); *In re Gardner,* 534 A.2d 947, 951 (Me. 1987); *Matter of Farrell,* 108 N.J. 335, 347, 529 A.2d 404 (1987); *Leach* v. *Akron General Medical Center,* 68 Ohio Misc. 1, 9, 426 N.E.2d 809 (1980). In addition, many courts have found a right to refuse medical treatment without explicitly finding such a right constitutional. See *Conservatorship of Drabick,* 200 Cal. App. 3d 185, 245 Cal Rptr. 840 (1988); *Matter of Peter by Johanning,* 108 N.J. 365, 529 A.2d 419 (1987); *Delio* v. *Westchester County Medical Center,* 129 App. Div. 2d 1, 516 N.Y.S.2d 677 (1987).[10]

---

[10] Two courts have recently refused to sanction the removal of artificial nutrition and hydration. *Cruzan* v. *Harmon,* 760 S.W.2d 408 (Mo. 1988); *Westchester County Medical Center on Behalf of O'Connor,* 72 N.Y.2d 517, 531 N.E.2d 607, 534 N.Y.S.2d 886 (1988). These cases are distinguishable because, contrary to the present case, neither patient was terminally ill.

## B

Many of the cases upholding a right of self-determination for terminally ill individuals have urged legislatures to enact guidelines for appropriate private decision-making in these heart-rending dilemmas. *Barber* v. *Superior Court,* 147 Cal. App. 3d 1006, 1014, 195 Cal. Rptr. 484 (1983); *Matter of Peter by Johanning,* supra, 378; *Matter of Farrell,* supra, 341–42; *Matter of Conroy,* 98 N.J. 321, 344–45, 486 A.2d 1209 (1985). When the legislature has attempted to respond to this urgent request for statutory assistance, we have an obligation to pursue the applicability of statutory criteria before resorting to an exploration of residual common law rights, if any such rights indeed remain. We must therefore decide whether a reasonable construction of our act ever permits the removal of a gastrostomy tube.

Careful examination of our act discloses that the legislature approached the appropriate treatment for very sick patients by establishing three guiding principles. First, if a patient, in the eyes of his or her attending physician, is not in a terminal condition, "beneficial medical treatment and nutrition and hydration must be provided." General Statutes § 19a-571. Second, if a patient, to the contrary, is deemed by his or her physician to be in a terminal condition, life sustaining technology may be removed, in the exercise of the physician's best medical judgment, when that judgment has received the informed consent of the patient's next of kin or guardian and when it coincides with the expressed wishes of the patient. General Statutes § 19a-571. Third, even the removal of life sustaining technology must be done in a manner consistent with providing "comfort care and pain alleviation" for the patient. General Statutes § 19a-573.

Implicit in this set of guidelines is the legislature's determination that "beneficial medical treatment," "nutrition and hydration," and "comfort care and pain alleviation" constitute three *different* sets of services for patients. The act clearly validates, for example, in the proper circumstances, the removal of a respirator from a terminally ill patient. The definition of "beneficial medical treatment" in § 19a-570 (2) includes "the utilization of artificial technology to sustain life." The latter concept is further explained in the definition of "life support system" in § 19a-570 (1) as including "any mechanical or electronic device . . . to replace, assist or supplement the function of any human vital organ . . . . " A terminal patient whose respirator is removed must continue to receive both nutrition and hydration by normal means; § 19a-571; and comfort care and pain alleviation. General Statutes § 19a-573.

The guidelines are not equally clear when, as in the present case, the issue is the possible removal of a gastrostomy tube. The problem is created by the exclusion of the provision of nutrition and hydration from the definition, in § 19a-570 (1), of a "life support system" whose removal is authorized, in proper circumstances, by § 19a-571. Presumably, however, this exclusion must be read in a manner consistent with the dictate of the final sentence of § 19a-571, which distinguishes between "beneficial medical treatment" (including artificial technology) on the one hand and "nutrition and hydration" on the other. In that context, it makes sense to recognize a further distinction between artificial technology to assist nutrition and hydration a fortiori included within the definition of a "life support system," and normal procedures to assist in feeding.[11]

---

[11] Nothing in the legislative history of the enactment of the Removal of Life Support Systems Act specifically addresses this distinction. Those legislators who expressed their view that "in all cases hydration and nutrition shall be provided," may well have been referring to providing hydration

In other words, the act, read in its entirety and giving effect to every section; see *Hayes* v. *Smith,* 194 Conn. 52, 58, 480 A.2d 425 (1984); *Berger* v. *Tonken,* 192 Conn. 581, 589, 473 A.2d 782 (1984); implicitly contemplates the possible removal from a terminally ill patient of artificial technology in the form of a device such as a gastrostomy tube, but it does not, under any circumstances, permit the withholding of normal nutritional aids such as a spoon or a straw.[12]

Our construction of the act to permit removal of a gastrostomy tube implements its beneficent purpose of providing functional guidelines for the exercise of the common law and constitutional rights of self-determination that, as we have noted above, have received almost universal recognition. The applicable case law has by and large concluded that, as a constitutional matter, there is no logical distinction between removal of a respirator and removal of a gastrostomy tube. See also *Gray* v. *Romeo,* supra; *Bouvia* v. *Superior Court,* supra, 1141; *In re Gardner,* supra, 954; *Brophy* v. *New England Sinai Hospital, Inc.,* supra, 435–38.[13]

and nutrition by ordinary rather than by extraordinary means. See 28 H.R. Proc., Pt. 35, 1985 Sess., p. 12,616 (Rep. William L. Wollenberg), and pp. 12,646–47 (Rep. Norma Gyle).

Other courts have indicated that " '[m]edical procedures to provide nutrition and hydration are more similar to other medical procedures than to typical human ways of providing nutrition and hydration. Their benefits and burdens ought to be evaluated in the same manner as any other medical procedures.' " *Conservatorship of Drabick,* 200 Cal. App. 3d 185, 195 n.9, 245 Cal. Rptr. 840 (1988), quoting *Barber* v. *Superior Court,* 147 Cal. App. 3d 1006, 1016–17, 195 Cal. Rptr. 484 (1983).

[12] We note that the statute could have been drafted to require expressly that hydration and nutrition be made available even through artificial devices. For example, the Missouri statute defines "death-prolonging procedure" as not including "the administration of medication or the performance of medical procedure deemed necessary to provide comfort, care or to alleviate pain [or] the performance of *any* procedure to provide nutrition or hydration . . . ." (Emphasis added.) Mo. Rev. Stat. § 459.010 (3) (1986).

[13] The American Medical Association and The President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research agree that artificial nutrition and hydration are forms

The plaintiffs in this case have indeed raised such a constitutional claim. We need not, however, address this claim on its merits when we can instead find redress for the plaintiffs by an appropriate construction of the applicable statutes. Established wisdom counsels us to exercise "self-restraint" so as "to eschew unnecessary determinations of constitutional questions." *State* v. *Torres,* 206 Conn. 346, 362, 538 A.2d 185 (1988); *Negron* v. *Warden,* 180 Conn. 153, 166, 429 A.2d 841 (1980). It is, nonetheless, relevant to our construction of the statutory exclusion that our interpretation avoids placing the Removal of Life Support Systems Act in constitutional jeopardy. *State* v. *Champagne,* 206 Conn. 421, 437, 538 A.2d 193 (1988); *Moscone* v. *Manson,* 185 Conn. 124, 128, 440 A.2d 848 (1981); *Kron* v. *Thelen,* 178 Conn. 189, 197, 423 A.2d 857 (1979).

---

of medical treatment that may be removed from terminally ill patients under some circumstances. The Council on Ethical and Judicial Affairs of the American Medical Association in its statement issued March 15, 1986, stated: "Even if death is not imminent but a patient's coma is beyond doubt irreversible and there are adequate safeguards to confirm the accuracy of the diagnosis and with the concurrence of those who have responsibility for the care of the patient it is not unethical to discontinue all means of life prolonging medical treatment. Life prolonging medical treatment includes medication and artificially or technologically supplied respiration, nutrition or hydration."

The President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research found "no particular treatments—including such 'ordinary' hospital interventions as parenteral nutrition or hydration, antibiotics, and transfusions—to be universally warranted and thus obligatory for a patient to accept." The President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research: Deciding to Forego Life-Sustaining Treatment (1983), p. 90. The commission emphasized the importance of "providing respectful, responsive, and supportive care to patients for whom no further medical therapies are available or elected; and encouraging health care institutions to take responsibility for ensuring that adequate procedures for decisionmaking are available for all patients." The President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research: Summing Up (1983) p. 34.

C

Even if, in the proper circumstances, the Removal of Life Support Systems Act authorizes removal of a gastrostomy tube as a matter of law, the question remains whether the plaintiffs are entitled to invoke the act as a matter of fact. The trial court found that the plaintiffs had met their burden of proof, by clear and convincing evidence, on each of the factual statutory requisites. These findings by the trial court are challenged on this appeal. One or another of the defendants contests that: (1) the patient is in a terminal condition; (2) proper consent has been obtained from next of kin; and (3) the patient's wishes were expressed with sufficient clarity to warrant credibility at the present time. We conclude that the record supports the trial court's findings of fact which are as applicable to the terms of the act as they are to the common law causes of action upon which the trial court, as a matter of law, rested its judgment.

Under the act, the patient's attending physician must deem "the patient to be in a terminal condition." General Statutes § 19a-571 (2). For the purposes of the act, " '[t]erminal condition' " means the final stage of an incurable or irreversible medical condition which, in the opinion of the attending physician, will result in death." General Statutes § 19a-570 (3). Dr. Robert Ruxin serves as Mrs. McConnell's attending physician and he testified that he deemed her to be in a terminal condition. While there was testimony to the contrary on this issue, the act places the responsibility for reaching the conclusion with the *attending physician,* contemplating a decision to discontinue treatment reached after consultation between the attending physician and the family or next of kin, unimpeded by courts, other med-

ical experts or ethicists.[14] See *Conservatorship of Drabick,* supra, 200 (the court should confine its involvement to ensuring that the conservator has made a "good faith" decision relying upon medical advice).

Ruxin reached his conclusion after numerous examinations of Mrs. McConnell. He deemed her to be in an incurable, irreversible, persistent vegetative state, a condition that ultimately will lead to her death. The trial court found Ruxin's testimony credible and we have discovered nothing in the trial transcripts to warrant disturbing this finding.

General Statutes § 19a-571 (3) requires that the attending physician obtain the informed consent of the patient's next of kin prior to removing a life support system. The fact that the rest of the McConnell family (husband John, daughters Kathleen and Amy, and son James), all over the age of majority, have brought this action indicates that they consent to the removal of the gastrostomy tube. Furthermore, the testimony of all four demonstrates positively that they reached their decision out of love and concern for their mother and wife and respect for her wishes. There is not a hint in the trial court testimony of any ulterior motive on the part of any of the plaintiffs. The trial court had no trouble finding the requisite consent of the next of kin and we conclude that it did not err in so finding.

Finally, pursuant to the act, the attending physician must consider "the patient's wishes as expressed by the patient directly, through his next of kin or legal guardian . . . . " General Statutes § 19a-571 (4). The trial court found clear and convincing evidence that Mrs. McConnell had expressed "forcefully and without wavering" that artificial means should not be

---

[14] The conclusion reached pursuant to General Statutes § 19a-571 (2) is inseparable from § 19a-571 (1), which requires that "the decision to remove such life support system [be] based on the best medical judgment of the *attending physician* . . . . " (Emphasis added).

employed to prolong her life. We conclude that the trial court did not err in this finding.

That Mrs. McConnell desired that her family not prolong her life should she ever suffer an injury that left her in a vegetative state could not have been clearer. She worked as a registered nurse in an emergency room, and therefore often saw the tragedy that befell those who suffered severe head injuries. The court heard testimony from a co-worker, Marie Kornhaas, that Mrs. McConnell did not believe in the use of respirators, feeding tubes or other life-sustaining systems, and that if she were ever placed on such a system, she hoped that Kornhaas would do what she could to stop it. Another co-worker, Elisa Goosman, testified that Mrs. McConnell was quite familiar with feeding tubes as a means of sustaining life and that she stated that "she never wanted to be a vegetable or a burden on her family."

The trial court heard testimony from all of Mrs. McConnell's immediate family that she was extremely concerned about head injuries, warning her children often about the dangers of motorcycles and small cars. Her husband described her as having "a phobia about head injury." She had also been adamant that her own mother, when dying of cancer, not be placed on any life support system. Finally, each member of her immediate family testified absolutely, without hesitation, that Mrs. McConnell did not believe in life support systems, including gastrostomy tubes, for herself, that she would want the tube removed from her and that they sought to carry out her wishes. We therefore conclude that the record sustains those findings of fact by the trial court that are required by the act to be shown as a condition for the withdrawal of life support systems. The trial court applied the correct standard of proof deter-

mining that there was clear and convincing evidence to support these findings. We agree.[15]

### III

In his brief, the Attorney General raises the spectre of suicide, claiming that the state has a compelling interest in preventing it and that to allow Mrs. McConnell to carry out her wish to discontinue food and nutrition would be to allow her to commit suicide. We are not persuaded that a suicide would occur in this case.

It is well established that the state may not base a criminal prosecution on the exercise of a constitutional right. *Roe* v. *Wade,* 410 U.S. 113, 162, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973); *Stanley* v. *Georgia,* 394 U.S. 557, 568, 89 S. Ct. 1243, 22 L. Ed. 2d 542 (1969). Because we hold that the legislature in enacting the Removal of Life Support Systems Act sought to establish a workable mechanism by which individuals may implement their common law and constitutional rights, it follows that by exercising these rights, the individual cannot become criminally liable. See *In re Quinlan,* 70 N.J. 10, 52, 355 A.2d 647 (1976).

Furthermore, we agree with the majority of jurisdictions that have addressed this issue in holding that the removal of a gastrostomy tube is not the "death producing agent," set in motion with the intent of causing her own death. In exercising her right of self-determination, Mrs. McConnell merely seeks to be free of extraordinary mechanical devices and to allow nature to take its course. Thus, death will be by natural causes underlying the disease, not by self-inflicted injury. See *Gray* v. *Romeo,* supra; *Foody* v. *Manchester Memorial Hospital,* 40 Conn. Sup. 127, 137, 482 A.2d 713 (1984); *Rasmussen by Mitchell* v. *Fleming,* 154 Ariz. 207, 218,

---

[15] Under our act, this clear expression of Mrs. McConnell's wishes is legally operative even though it was not memorialized in the form of a written document. General Statutes § 19a-572.

741 P.2d 674 (1987); *In re Gardner,* supra, 955–56; *Brophy* v. *New England Sinai Hospital, Inc.,* supra, 439; *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 743 n.11, 370 N.E.2d 417 (1977); *Matter of Conroy,* 98 N.J. 321, 350–51, 486 A.2d 1209 (1985); *In re Storar,* 52 N.Y.2d 363, 377–78 n.6, 420 N.E.2d 64, 438 N.Y.S.2d 266, cert. denied, 454 U.S. 858, 102 S. Ct. 309, 80 L. Ed. 2d 153 (1981); *Delio* v. *Westchester County Medical Center,* 129 App. Div. 2d 1, 23–24, 516 N.Y.S.2d 677 (1987); *In re Colyer,* 99 Wash. 2d 114, 123, 660 P.2d 738 (1983); R. Byrn, "Compulsory Lifesaving Treatment for the Competent Adult," 44 Fordham L. Rev. 1, 22–24 (1975).[16]

There is no error.

In this opinon CALLAHAN, GLASS and COVELLO, Js., concurred.

ARTHUR H. HEALEY, J., concurring. Although I agree with the ultimate result of no error, I am unable to agree with the analysis of the majority in reaching that result. It seems to me that crucial to the majority is the distinction advanced between "artificial technology to assist nutrition and hydration, and normal procedures to assist in feeding," and its characterization of a gastrostomy tube as a "life support system." This so-called "middle ground" construction of the statutory scheme "that is consistent with the plaintiffs' affirmative claims for relief," while so consistent, involves a flawed process of statutory construction.

As I read the opinion, it recognizes that a gastrostomy tube is "beneficial medical treatment" because that term, by definition in General Statutes

---

[16] The brief filed on behalf of the state's attorney raises no objections to the trial court's judgment in this case, but purports to preserve the right to contest such a judgment in other, as yet unspecified, circumstances. These representations do not present a justiciable issue at this time.

§ 19a-570 (2), includes "artificial technology to sustain life." It further recognizes that a gastrostomy tube qualifies as a "life support system," as that term is defined in § 19a-570 (1), in that the majority states that Mrs. McConnell, in exercising her right of self-determination, "merely seeks to be free of extraordinary *mechanical* devices and to allow nature to take its course." (Emphasis added.) In my view, the majority decides that a gastrostomy tube, despite the exclusion of nutrition and hydration from the definition of "life support system" in the statutory scheme, and despite the majority's apparently conclusory position that such a tube is a "mechanical device" under the statute, nevertheless, does come within the purview of the statutory scheme. This statutory analysis I cannot accept.

I believe that a gastrostomy tube cannot, explicitly or implicitly, be regarded as a "life support system" under the statutory scheme. Rather, the use of a gastrostomy tube must be, and can be, decided in this case under the common law because its use does not fall within the statutory scheme.

The majority acknowledges a common law right of self-determination. It also suggests, without finding the necessity to decide, that, after the present statutory scheme was enacted, common law rights may be "residual . . . if any such rights remain." Elsewhere, it suggests that the statutory scheme "may implement" an individual's common law rights as well as their constitutional rights. I believe that such a common law right of self-determination exists. I agree with the majority to the extent that it acknowledges the existence of such a common law right. See, e.g., *Union Pacific Railway Co.* v. *Botsford,* 141 U.S. 250, 251, 11 S. Ct. 1000, 35 L. Ed. 734 (1891); *Schmeltz* v. *Tracy,* 119 Conn. 492, 495, 177 A. 520 (1935).

In arguing that the result reached by the majority in this case on statutory grounds should rather be reached under the common law, I believe that the statutory scheme did not entirely displace the common law. " 'It is an established rule of statutory construction that statutes are not readily interpreted as abrogating common-law rights.' *State* v. *Assuntino,* 173 Conn. 104, 106, 376 A.2d 1091 (1977). It is also a rule of statutory construction that statutes in derogation of the common law are to be strictly construed. *McKinley* v. *Musshorn,* 185 Conn. 616, 621, 441 A.2d 600 (1981); *Blue Cross & Blue Shield of Connecticut, Inc.* v. *Mike,* 184 Conn. 352, 361, 439 A.2d 1026 (1981); *State* v. *Beauton,* 170 Conn. 234, 241, 365 A.2d 1105 (1976). ' "No statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express." *Shaw* v. *Railroad Co.,* 101 U.S. 557, 565, 25 L. Ed. 892 [1880].' *Dennis* v. *Shaw,* 137 Conn. 450, 452, 78 A.2d 691 (1951)." *State* v. *Nugent,* 199 Conn. 537, 548, 508 A.2d 728 (1986).

The exclusion of "the provision of nutrition and hydration" from the definition of "life support system" strongly suggests a legislative intent to address only the withdrawal of "any mechanical or electronic device" from a terminal patient. The exclusion does not suggest an intent to displace the common law right to self-determination of one's bodily integrity as it pertains to the withdrawal of other medical treatment, including extraordinary means of nutrition and hydration. See, e.g., *Union Pacific Railway Co.* v. *Botsford,* supra; *Schmeltz* v. *Tracy,* supra. The language in § 19a-570 (1), "excluding the provision of nutrition and hydration," is not language that clearly evinces a legislative intent to displace the common law right of self-determination as it applies to types of medical treatment other than "life support system[s]." In addition,

it is a reasonable inference that the legislature did not intend wholly to displace the common law when one examines the last sentence of General Statutes § 19a-571 in the light of the entire statutory scheme. That sentence requires the provision of "beneficial medical treatment and nutrition and hydration" where the attending physician "does not deem the patient to be in a terminal condition . . . . " A reasonable inference from that sentence is that where the patient is in a terminal condition, as is McConnell, then beneficial medical treatment and nutrition and hydration need not be provided.[1]

I agree with the majority that the gastrostomy tube constitutes beneficial medical treatment. I say this having already noted the distinction that the majority makes between "artificial technology" and "normal procedures" to assist the process of nutrition and hydration. I disagree, however, with the majority's reasoning where it maintains that "artificial technology to assist nutrition and hydration," i.e., beneficial medical treatment, is "a fortiori included within the definition of a 'life support system.'. . ." It seems to me that while a "life support system" is necessarily "beneficial medical treatment," it does not follow that all "beneficial medical treatment" constitutes a "life support system" in this statutory scheme. Certain medical treatment may be "artificial technology to sustain life," and thus be "beneficial medical treatment" under the statute, without qualifying as a "life support system" under the statute, which necessarily must be a "mechanical or electronic device." In contrast, "any mechanical or electronic device" used to "assist or sup-

---

[1] The legislative history, particularly the view expressed by two legislators that "in all cases hydration and nutrition shall be provided" is hardly sufficient to indicate the legislative intent to displace the common law, especially in view of the express language of the statute. See majority opinion, n. 11.

plement" bodily functions which "prolongs the dying process" must be considered "artificial technology to sustain life." The majority never explains how a gastrostomy tube qualifies as a "mechanical or electronic device" and thus never explains how the gastrostomy tube can be considered a "life support system" in the statutory scheme.

I conclude that a gastrostomy tube cannot be characterized as a "mechanical or electronic device." "The G-tube is a pliable silicone tube, about one and one-half feet in length with two openings at the top. Food enters the larger opening of the G-tube via plastic tubing, some two and one-half feet long, which in turn is connected to a plastic bag which hangs above the level of the patient (allowing the liquid food to flow from the bag by means of gravity into the G-tube)." *Brophy* v. *New England Sinai Hospital, Inc.,* 398 Mass. 417, 425–26, 497 N.E.2d 626 (1986). The gastrostomy tube, then, is not "of, relating to, or concerned with machinery"; N. Webster, Third International Dictionary; but merely is a system that operates by natural force—gravity. It cannot, therefore be considered a "life support system" under the statute because it is not a mechanical device.

Even assuming that there is no practical distinction between the removal of a respirator, a typical "life support system," and a gastrostomy tube, which is implicit in the majority's holding, the statute clearly recognizes a distinction for purposes of delineating the statute's scope. For the reasons given above, the legislative intent was not wholly to displace the common law, but to preserve it by limiting the purview of the statute to the removal of "mechanical and electronic devices" from terminal patients.

Under the common law, McConnell has a right to refuse medical care in the form of extraordinary nutrition and hydration, here a gastrostomy tube. I agree

that it has been established by clear and convincing evidence that McConnell's expressed desires, when she was competent to exercise that common law right, were to refuse such extraordinary medical care under her current condition. In my view, therefore, the only remaining question is whether there is some compelling state interest which overrides her right to self-determination concerning her own body. I recognize that the common law right to refuse medical treatment is not absolute, and, in some cases, may yield to a compelling state interest. In doing so, I believe that each case is unique, as is each life, and must be determined upon the circumstances special to each case. In short, I see no rule capable of general application in such terminal cases.

Four compelling state interests appear to have been commonly identified by courts and commentators in such decisions: (1) the preservation of life; (2) the prevention of suicide; (3) the protection of innocent third parties; and (4) the maintenance of the ethical integrity of the medical profession. See, e.g., *Matter of Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985); *Matter of Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981); note, "In re Storar: The Right to Die and Incompetent Patients," 43 U. Pitt. L. Rev. 1087, 1092 (1982). This, then, involves the duty of a court to balance McConnell's right to refuse the use of the gastrostomy tube against these four state interests.

Some courts have considered the state's interest in preserving life to be the most significant of these interests. See, e.g., *Brophy* v. *New England Sinai Hospital, Inc.,* supra, 432; *Matter of Conroy,* supra, 349. Initially, it seems that with McConnell in an irreversible persistent vegetative state with no prospect of improvement, this interest of the state is, on balance, greatly diminished. Thus, the "life" she did not wish to live flickers on without the health or hope that the

state properly seeks to guard. In this case, given her unchallenged wishes and her current circumstances, the state's interest in protecting her life is not, I believe, weighty in the total mix of the state's interests.

The state also has a special interest in preventing suicide. Suicide requires a specific intent to die which courts have found absent in persons who have refused extraordinary methods of medical care. See, e.g., *Matter of Conroy,* supra, 350–51; *Matter of Eichner,* 73 App. Div. 2d 431, 466–67, 426 N.Y.S.2d 517 (1980), modified in part, *Matter of Storar,* supra. Certainly, receiving nutrition and hydration by a gastrostomy tube is nutrition and hydration by extraordinary means. Rather than intending suicide, McConnell's desire simply is not to receive nutrition and hydration in an extraordinary manner. Her death, when it occurs, therefore, will not be the result of suicide, i.e., self-inflicted, but will be the final result of her inability to receive nutrition and hydration by other than extraordinary means. See *Delio* v. *Westchester County Medical Center,* 129 App. Div. 2d 1, 24, 516 N.Y.S.2d 677 (1987); see also *Matter of Peter by Johanning,* 108 N.J. 365, 382, 529 A.2d 419 (1987); *In re Requena,* 213 N.J. Super. 475, 478–79, 517 A.2d 886, aff'd, 213 N.J. Super. 443, 517 A.2d 867 (1986) (decision to refuse extraordinary feeding is not "positive act to terminate life" but is only "acquiescence in the natural shutting down of a critical bodily function" and thus is not suicide).

The third state interest, protecting innocent third parties, is not present in this case. McConnell's husband and children (all of whom are adults) obviously love, cherish and care for her. This wrenching tragedy has resulted in the awesome decision in which they have all joined. I do not consider this element of the state's interest in overriding McConnell's wishes any makeweight under all of the circumstances.

Finally, there is the state's interest in maintaining the ethical integrity of the medical profession. One court has noted that "[t]his interest has largely been overcome or at least lessened by the prevailing medical ethical standards which do not require medical intervention at all costs." *Delio* v. *Westchester County Medical Center,* supra, 25; see generally *Brophy* v. *New England Sinai Hospital, Inc.,* supra, 439 n.38; *Matter of Conroy,* supra, 351. The medical evidence in this case is clearly on the side of careful, informed and ethically oriented judgment of McConnell's condition and prognosis. In this case, I have difficulty believing that this state interest, singly or collectively, with my views of those interests in this case, serves to override McConnell's wishes.

On balance, McConnell's common law right to self-determination of her bodily integrity, as exercised through her clearly expressed desire not to have her terminal condition extended by extraordinary means, is wholly disproportionate and overbearing in comparison to any interests that the state may seek to further by prohibiting the withdrawal of her gastrostomy tube. In this case, such a prohibition would be unduly burdensome, particularly in light of the uncontroverted prognosis that McConnell has no hope of recovery to a cognitive and sapient life.

In summary, the removal of McConnell's gastrostomy tube, in my opinion, cannot be governed by General Statutes §§ 19a-570 to 19a-575. The gastrostomy tube cannot be considered a "life support system" and therefore the provisions of the statutory scheme that address liability for the removal of "life support systems" are inapplicable. Rather, this case is governed by the common law right to self-determination of one's bodily integrity. There being clear and convincing evidence that it is McConnell's wish never to have her body and dignity invaded in order to provide extraordinary treatment that would

maintain her in this tragic and terminal condition, and there being no state interests that outweigh the exercise of this right, McConnell's gastrostomy tube must be removed.

Therefore, I concur in the result.