**Richard JOHNSON, Plaintiff,**

v.

**CARPENTER TECHNOLOGY CORP., Defendant.**

**Civ. No. B–88–408 (TFGD).**

United States District Court, D. Connecticut.

Sept. 26, 1989.

Frank J. Riccio, Bridgeport, Conn., for plaintiff.

Michael N. LaVelle, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for defendant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

DALY, District Judge.

This diversity action poses the question of what, if any, protection Connecticut law offers to an individual fired after twenty-three years of service for his apparent refusal to submit to a random drug and alcohol screening sought by a private employer without any suspicion of drug or alcohol use. Pending before the Court is Carpenter Technology Corporation's ("Carpenter") motion for summary judgment on all counts of Richard Johnson's ("Johnson") complaint.

## BACKGROUND

Carpenter hired Richard Johnson as a hack saw operator for its Bridgeport plant in May, 1963. Though initially a union member covered by the provisions of the collective bargaining agreement, Carpenter promoted Johnson in June, 1968 to the position of foreman—a supervisory position not covered by the collective bargaining agreement. He remained in this position until July 8, 1986, when he was terminated for failure to submit to a drug and alcohol urinalysis screening.

On June 11, 1986, Carpenter instituted a drug and alcohol policy for its employees. Prior to the effective date of the policy, Carpenter took certain steps to notify its employees about it by distributing a written pamphlet entitled "Prescription for a Safe Work Place" to all employees, by posting notices on various plant bulletin boards, and by conducting training sessions for supervisory and management officials concerning the policy. Johnson admits hearing of and discussing the policy, seeing notices describing it, and attending meetings concerning it, but alleges that he was confused about whether such a policy had in fact been adopted, and whether the policy came into effect during the period that the union was challenging its implementation during negotiations.

The policy provided that, *inter alia*, an employee would be tested for drugs and alcohol "[a]t the time and as part of all company required physical examinations." Def.Exh. 2 at 1, ¶ 2. In spite of any confusion he might have had about the policy, on July 7, 1986 Johnson and other employees were directed to report to Carpenter's nurse's office for a physical examination. Having arrived at the office, Johnson was told that he needed to supply a specimen

for urinalysis and would also receive an eye exam. Johnson refused to give a specimen, asking that he be allowed to consult with a lawyer prior to doing so. After refusing to submit to the test, Johnson was directed to return to his job and was not given an eye examination. Later that day, he was directed by a supervisor to submit to the drug and alcohol screening and once again Johnson stated that he wished to talk to a lawyer first. The next day when Johnson reported to work he was given his pay and immediately fired, and according to Johnson not given any explanation for the termination.[1]

On July 22, 1988, Johnson commenced this action alleging claims of wrongful discharge, breach of contract, promissory estoppel, and breach of the implied covenant of good faith and fair dealing.

## DISCUSSION

### A) SUMMARY JUDGMENT STANDARDS

Viewing the evidence and the inferences to be drawn therefrom in the light most favorable to the nonmoving party, summary judgment is appropriate under Fed.R. Civ.P. 56(c) when the evidence offered raises no genuine disputes of material fact and the moving party is entitled to summary judgment as a matter of law. *Cinema North Corp. v. Plaza at Latham Associates*, 867 F.2d 135, 139 (2d Cir.1989). The moving party bears the burden of proving that no genuine disputes of material fact exist. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). To defeat such a motion, the plaintiff must offer concrete evidence raising genuine disputes of material fact tending to show that his version of the events is more than fanciful; *id.;* Fed.R.Civ.P. 56(e); or, alternatively, must show that the defendant is not entitled to summary judgment as a matter of law.

### B) BREACH OF CONTRACT

Johnson alleges two distinct breach of contract claims. His first claim focuses on certain representations relating to job security allegedly made to him at the time that he was promoted to foreman in June of 1968. Specifically, Johnson testified at deposition that, in response to his questioning about what job protection he would have if he accepted the promotion and was no longer covered by the collective bargaining agreement, Carpenter officials said:

> that Carpenter always took care of their employees, (sic) didn't have to worry about that. If I could not handle the job, if I could not—if something went wrong they would find a place to keep me. In my twenty-three years work there it always happened that way.

Johnson Depo. at 69–70. Johnson claims to have sought this assurance because he and his wife had recently given birth to their second child. *Id.* He further states that he interpreted these alleged statements to mean that he "would not have to worry about [his] job." [2] *Id.* at 68. His firing, he now claims, violated an oral agreement he and Carpenter officials entered into in June of 1968.

Carpenter disputes Johnson's description of the conversation, claiming it only stated the generic words of comfort that the employer always takes care of its own. Carpenter argues that, as a matter of law, Johnson was merely an at-will employee subject to discharge at any time with or without just cause and that the assurance he contends Carpenter gave was not sufficiently promissory, nor sufficiently definite to alter the at-will employment relationship existing between the parties.

The Court disagrees at this stage of the proceedings for two reasons. First, the parties' dispute about what was stated in response to Johnson's job security concerns is one of material fact. The Court agrees that the statement that Carpenter takes care of its own, viewed in isolation, is

---

**1.** Johnson contends that, after conferring with counsel on July 7, 1986, he was ready to submit to the drug test but was fired on July 8, 1986 before he was given the opportunity to comply.

**2.** Other supervisors promoted from the union later subject to demotion were reassigned or transferred back to the union, Johnson alleges. *Id.* at 70.

insufficiently definite and promissory to form the basis for a breach of contract or promissory estoppel claim.[3] *See D'Ulisse–Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 214–15, 520 A.2d 217 (1987) (noting, *inter alia,* that a promissory estoppel claim lacks the common law contract requirement of consideration and instead focuses on the question of reliance). But construing all inferences in Johnson's favor and viewing the entire statement as recollected by him in the context of and in response to his expressed job security concerns, the Court is not prepared to state as a matter of law that Carpenter's representations did not alter the parties' at-will relationship.

The representations alleged to have been made in these circumstances are akin to those discussed by the Connecticut Supreme Court in *Coelho v. Posi–Seal Int'l Inc.,* 208 Conn. 106, 544 A.2d 170 (1988). As in *Coelho,* in the absence of definitive contractual language, the parties' intentions as to the scope of their contractual commitments is an inference of fact best left to the jury. *Id.* at 113, 544 A.2d 170.

Johnson's second contractual claim is that he is entitled to rely on the provisions of the drug and alcohol policy manual in determining the contours of his employment contract and, more specifically, in describing the circumstances under which drug and alcohol screening would take place. Toward this end, Johnson raises a number of factual disputes concerning Carpenter's alleged failure to abide by the provisions of the policy manual in conducting the urinalysis screening.

■ As noted by Carpenter, many of these disputes are not material. Yet, while Carpenter goes to some length to establish that Johnson was aware of the drug and alcohol policy, had participated in discussions about it, and should have known that it had in fact gone into effect, it also argues that because Johnson candidly admitted he did not know the program had gone into effect he is not entitled to rely on the

testing procedures contained in it. Carpenter is correct in noting that while Connecticut law recognizes that personnel manuals may provide the basis for an employment contract, *see e.g., Carbone v. Atlantic Richfield Co.,* 204 Conn. 460, 471, 528 A.2d 1137 (1987), to establish a contract claim based on the procedures set forth in an employment manual, usually, one must establish his knowledge of and reliance upon such procedures. *See Sivell v. Conwed Corp.,* 666 F.Supp. 23, 27 (D.Conn.1987). Here, however, Carpenter seeks to rely on the policy's provisions in establishing its right to terminate Johnson for refusing to submit to urinalysis and at the same time deprive Johnson of the right to insist that Carpenter conduct its screening in accord with its written representations. The Court cannot countenance such a result because Carpenter, in modifying the nature of the employment relationship by promulgating the drug and alcohol policy and testing, committed itself to certain procedures. Moreover, the record before the Court is unclear whether Johnson was unaware of both the particulars and the effective date of the policy or was simply unaware of the latter, while implicitly relying on the former.

■ Through his own testimony and the affidavits submitted in support of this claim, Johnson raises a material factual dispute that, ultimately, must await jury determination. This dispute concerns whether Carpenter abided by its representation that it would screen its employees only: 1) as part of a required physical examination; or 2) or in connection with crane operator, mobile equipment operator, and inspector exams. The jury must determine whether Johnson was due for a drug and alcohol screen as part of a physical examination or pursuant to an equipment oriented safety requirement or was simply subjected to a random drug sweep of a particular department at the Bridgeport plant. The Court finds material Johnson's contentions that he had not been given an

---

**3.** The parties have not expressly limited this claim to either theory and the Court elects to

follow their lead.

annual physical examination at Carpenter's behest for at least several years prior to July 6, 1986 and that after refusing the urinalysis he was not subjected to further medical examination or the vision test which was purportedly to be given. Similarly, though Johnson was certified by Carpenter as a mobile equipment operator, Johnson asserts that he was a supervisor, not an equipment operator. In light of Carpenter's countervailing claims that Johnson's screening was initiated in accordance with its written procedures, these material factual disputes preclude summary judgment on this claim.

## C) WRONGFUL DISCHARGE AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The Court must also consider Johnson's claim that, notwithstanding any contract or promissory estoppel claims, his termination contravened public policy sufficient to support the counterpart claims of wrongful discharge and breach of the implied covenant of good faith and fair dealing. *See Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 572, 479 A.2d 781 (1984) (implied covenant *contract* claim subject to the same standard of liability); *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 476–80, 427 A.2d 385 (1980) (wrongful discharge *tort* claim).

An employee otherwise terminable at will may not be discharged for some "demonstrably improper reason ... whose impropriety is derived from some important violation of public policy." *Magnan*, 193 Conn. at 572, 479 A.2d 781 (citing *Sheets*, 179 Conn. at 475, 427 A.2d 385). This is an exception to the general rule that an employee terminable at will is otherwise subject to termination without good cause. While allowing the employer, in ordinary

circumstances, to make personnel decisions without fear of incurring personal liability, this exception protects employee job security from employer actions that contravene public policy. *Morris v. Hartford Courant Co.*, 200 Conn. 676, 679, 513 A.2d 66 (1986).

As is often the case, the state courts have not had an opportunity to address the question posed: whether the termination of employment for failure to submit to a private employer's drug and alcohol screening undertaken without notice and any kind of reasonable suspicion contravenes public policy. Therefore, in exercising its diversity jurisdiction the Court must attempt to decide how the Connecticut Supreme Court would resolve this matter. *Plummer v. Lederle Laboratories*, 819 F.2d 349, 355 (2d Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). To discern and to divine any such public policy the Court must first look to Connecticut's statutory and constitutional provisions and judicial precedent. *Morris*, 200 Conn. at 680, 513 A.2d 66.

■ Effective October 1, 1987, Connecticut enacted into law Public Act No. 87–551 (the "Act") requiring that employee drug testing by a private employer be predicated on "reasonable suspicion that the employee is under the influence of drugs or alcohol which adversely affects or could adversely affect such employee's job performance." Conn.Gen.Stat. § 31–51x(a). The exceptions to this general rule permits random testing of employees: 1) involved in high risk or safety sensitive occupations, or 2) pursuant to a voluntary employee assistance program, or 3) to any extent permitted by federal law. Conn.Gen.Stat. § 31–51x(b).[4]

Though this Act unequivocally implicitly expresses a public policy upon which John-

---

**4.** The Act also provides that no employer may decide an "employee's eligibility for promotion, additional compensation, transfer, termination, disciplinary or other adverse personnel action solely on the basis of a positive urinalysis drug test result unless" the employer has used a reliable and accepted test methodology and confirmed the positive test result by two additional, independent tests of the same sample. Conn. Gen.Stat. § 31–51u. The Act also forbids direct observation of an employee in the process of providing a urine specimen and mandates that the results of any such test remain confidential. *See* Conn.Gen.Stat. § 31–51w. Finally, an employee can bring a civil action for violation of its provisions pursuant to which an employee might recover general and special damages, costs, and attorney's fees. Conn.Gen.Stat. § 31–51z.

son might support his discharge and implied covenant claims, it has no application to this case because it established that policy *after* plaintiff's refusal to submit to screening. As is true with most statutes not specifically applied retrospectively, the Court must construe them as having only prospective application. *See Nagle v. Wood,* 178 Conn. 180, 423 A.2d 875 (1979) (a statute affecting substantive rights is presumed to apply prospectively absent clear legislative intent to create retroactivity); *see also Hydro Air of Connecticut, Inc. v. Versa Technologies, Inc.,* 599 F.Supp. 1119, 1123 (D.Conn.1984). Though Johnson argues that the statute merely vindicates pre-existing rights and policy notions surrounding employment relations, that argument is not borne out by a review of the Act's legislative history.[5] Accordingly, if it exists, Johnson's public policy claim must be found elsewhere.

■ Looking elsewhere, Johnson identifies a number of other statutory provisions he claims support the public policy he asks this Court to discover.[6] Simply stated, most of these provisions have little relevance to this case and do not merit discussion. Though Connecticut law prohibits

the surveillance of locker rooms and the like, such law reflects a policy determination that an employer's right to monitor, control, and direct job performance has limits that are partially checked by employee needs for private areas in which to wash, change, shower, and relax. While certain privacy notions are encompassed within this law, they are sufficiently distinct from the facts of this case and the countervailing employer interests present here in production, job safety, and discipline such that they have no application to this case.

Johnson also attempts to discern a public policy that will support his discharge and implied covenant claims from the right to privacy. Despite the importance of that right as defined in federal constitutional terms[7], in the context of an employee's claim against a private employer such a right has little force because it protects against incursions by the government and persons acting as government agents.[8] *See Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (acts of private individuals are beyond the scope of "state action" and are thus beyond the protections of the federal constitution unless the state has exercised coercive power,

---

**5.** As noted by Representative Adamo, the Act "puts in place what [the legislature felt was] necessary to control random and unnecessary drug testing of employees in the workplace...." House Proc. at 11373 (May 29, 1987). Similarly, Senator Spellman noted that the "bill *limits* the circumstances under which an employer can conduct random drug tests...." Senate Proc. at 5060–61 (June 1, 1987) (emphasis added). The implication of both statements is that the Act was remedial in nature and not simply a recognition of what had gone before.

**6.** *E.g.,* Conn.Gen.Stat. § 1–19(b)(2) (protecting from disclosure under laws on freedom of information "personnel or medical files or similar files the disclosure of which would constitute an invasion of personal privacy"); Conn.Gen.Stat. § 4–67 (protecting the confidentiality of state employees' medical records); Conn.Gen.Stat. § 10–209 (providing for the confidentiality of school medical examination records); Conn. Gen.Stat. § 31–48b(b) (prohibiting the use of electronic surveillance mechanisms to record or monitor the activities of employees in areas designed for their personal comfort, such as rest rooms, locker rooms or lounges); Conn.Gen. Stat. § 31–128f (prohibiting an employer from

disclosing any information in the personnel file or records of an employee without his or her consent); Conn.Gen.Stat. § 53–41a (punishing the use of surveillance devices, windows or peepholes in dressing rooms).

**7.** *See generally Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right to privacy implicated in decision whether or not to terminate a pregnancy); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (miscegenation law and the right to privacy); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (marital contraceptive use and the right to privacy); *but cf. Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (privacy protection not extended to private consensual homosexual activity).

**8.** The same is true of any claim that the drug and alcohol testing at issue violated the fourth amendment's proscription against unreasonable searches. *Skinner v. Railway Labor Executives' Ass'n,* —— U.S. ——, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989) (fourth amendment protects against "certain arbitrary and invasive acts by officers of the Government or those acting at their direction").

making the act that of the state). Nor does Connecticut's constitution appear to recognize such a right.

In other contexts, Connecticut has through its common law given some protection to an individual's right to privacy. In 1982, the Connecticut Supreme Court recognized the common law tort of invasion of privacy. *Goodrich v. Waterbury Republican American, Inc.,* 188 Conn. 107, 125–128, 448 A.2d 1317 (1982). One may recover damages for injuries to one's emotional and mental well-being for an intentional intrusion upon the seclusion of one's private affairs if such intrusion would be deemed highly offensive to a reasonable person. *Restatement (Second) Torts* § 625B; *see also O'Brien v. Papa Gino's of America, Inc.,* 780 F.2d 1067, 1072 (1st Cir.1986).

The Connecticut common law has also given further support to the concept of individual privacy in its recognition of the right to self-determination in the course of one's medical treatment. More particularly, recently the Connecticut Supreme Court in *dicta* reaffirmed its view of the existence of this right in a case concerning a family's attempt to have honored a comatose terminally ill patient's express wish not to have her life prolonged by extraordinary means. *McConnell v. Beverly Enterprises–Connecticut, Inc.,* 209 Conn. 692, 553 A.2d 596 (1989); *see also Foody v. Manchester Memorial Hospital,* 40 Conn. Supp. 127, 482 A.2d 713 (1984).

Johnson argues that these common law constructs encompass a public policy core of privacy broad enough to protect an employee's privacy rights vis-a-vis a private employer's demand for a urine specimen. The Court disagrees. First, the Court is bound by the Connecticut Supreme Court's narrow construction of the public policy exception to the at-will employment doctrine. *See Sheets,* 179 Conn. at 477, 427 A.2d 385; *see also Battista v. United Illuminating Co.,* 10 Conn.App. 486, 498, 523 A.2d 1356 (1987), *certif. denied,* 204 Conn. 802, 525 A.2d 1352 (1988) ("plaintiff's position would expand the narrow exception to the at will employment rule and thus upset the delicate balance, struck by that exception, between the legitimate interest of employer and employee"). Moreover, the state's highest court has also suggested in *Morris* that the contravention of public policy entails something more than the commission of a simple tort. 200 Conn. at 676, 513 A.2d 66 ("[a] false but *negligently* made accusation of criminal conduct as a basis for dismissal is not a 'demonstrably *improper* reason for dismissal'") (emphasis in original). In light of such precedent the Court will not lightly undertake to construe a violation of public policy on the basis of an alleged tort violation peculiarly designed to protect the notion of personal rights rather than the collective public good. Additionally, the Court finds that the interests protected by the right of self-determination, though overlapping to some small extent, are too far afield from the interests implicated by Johnson's claim of privacy. Therefore, because Johnson has failed to establish that the circumstances surrounding his termination ran afoul of public policy, his claims of wrongful discharge and breach of the implied covenant of good faith and fair dealing cannot go forward.

## CONCLUSION

Carpenter's motion for summary judgment is GRANTED in part and DENIED in part. Material factual disputes preclude summary judgment on Johnson's breach of contract/promissory estoppel claims. Carpenter is, however, entitled to summary judgment on Johnson's wrongful discharge and implied covenant claims. Johnson shall file by October 6, 1989 an amended complaint that comports with this Ruling.

SO ORDERED.