**In the Matter of Charlotte F. TAVEL, a disabled person.**

**No. 225, 1995.**

Supreme Court of Delaware.

Submitted: July 25, 1995.
Decided: August 2, 1995.

Selma Hayman, Cooperating Atty. for the American Civil Liberties Union, Delaware Affiliate, Wilmington, for petitioner, Barbara Tavel–Lipnick, Guardian of the person of Charlotte F. Tavel.

Thomas Herlihy, III, Wilmington, ad litem for Charlotte F. Tavel.

Michael J. Rich, State Sol. (argued), and A. Ann Woolfolk, Deputy Atty. Gen., Dept. of Justice, Wilmington.

Before VEASEY, C.J., and WALSH, and HOLLAND, JJ.

HOLLAND, Justice:

On November 1, 1994, Barbara Tavel–Lipnick ("Mrs. Tavel–Lipnick" or "daughter"), guardian of the person for her mother, Charlotte Tavel ("Mrs. Tavel" or "mother"), filed a petition in the Court of Chancery. The petition requested authorization to remove a feeding tube from her mother so that her mother would be allowed to die. The Court of Chancery appointed an attorney *ad litem* to represent Mrs. Tavel's interests independently. The State of Delaware ("State"), through the Attorney General, was directed to Show Cause why Mrs. Tavel–Lipnick's petition should not be granted.

On March 3, 1995, the Court of Chancery conducted an evidentiary hearing on the merits of the petition. Having completed an independent investigation, the attorney *ad litem* elected to join with Mrs. Tavel–Lipnick in petitioning for the removal of the feeding tube, arguing that the removal would be in Mrs. Tavel's best interests. The State opposed the petition, contending that Mrs. Tavel's feeding tube should remain in place to keep her alive.

On May 19, 1995, the Court of Chancery granted Mrs. Tavel–Lipnick's petition for authorization to remove the feeding tube. On May 22, 1995, the Court of Chancery issued a temporary stay of its order to permit the State to file an appeal with this Court. This Court continued the stay on June 7 and again on June 12, 1995.

The State appeals the Court of Chancery's decision on three grounds. First, the State contends that the enactment of the Delaware Death With Dignity Act, 16 *Del.C.* § 2501 *et seq.*, established the exclusive procedures for terminating medical treatment or life support for incompetent individuals. Second, the State contends that even if the Death With Dignity Act is not the exclusive means for terminating medical treatment or life support, the Court of Chancery erred in finding that Mrs. Tavel–Lipnick had presented clear and convincing evidence that her mother would have wanted the feeding tube withdrawn. Third, the State contends that the attorney *ad litem* should not have been permitted to join with the guardian in her petition to withdraw the feeding tube but was required to advocate continued measures to sustain the ward's life.

This Court has concluded that the judgment of the Court of Chancery should be affirmed. This Court has also concluded that the attorney *ad litem* was not required to oppose the guardian's petition. The reasons for those determinations are set forth in this opinion.

## FACTS

The record reflects that in January 1992, Mrs. Tavel was an eighty-eight-year-old widow who lived by herself in Wilmington, Delaware. She enjoyed good health for her age. Mrs. Tavel was one of nine children and had outlived all of her siblings. Mrs. Tavel's closest living relative was her only child, Mrs. Tavel–Lipnick.

Mrs. Tavel's late husband was a respected Reform Jewish rabbi of the Temple Beth Emeth in Wilmington. Mrs. Tavel has been described as a devout and observant Reform Jew. The record reflects that she has been further described as life-loving, vivacious, independent, immaculate, dignified, and graciously vain.

On or about January 25, 1992, Mrs. Tavel suffered a devastating stroke and was taken to St. Francis Hospital. On receiving the news, Mrs. Tavel–Lipnick returned immediately from Fort Lauderdale, Florida to Wilmington to look after her mother. When Mrs. Tavel–Lipnick arrived at the hospital, she found that her mother appeared to recognize her but was unable to communicate in an appropriate manner.

The stroke had left Mrs. Tavel paralyzed on the left side of her body and virtually unresponsive on the right side. Mrs. Tavel remained able to eat but did not appear to have much interest in food. To ensure she received adequate sustenance, the nurses at St. Francis Hospital were often required to feed her through a syringe.

In the middle of February 1992, Mrs. Tavel was moved from St. Francis Hospital to the Ingleside Nursing Center ("Ingleside") in Hockessin, Delaware. Her condition continued to deteriorate. Mrs. Tavel–Lipnick has said that, apart from her first visit to her mother after the stroke, her mother has failed to recognize or respond to her. Mrs. Tavel began to lose her ability to chew and swallow food.

The record reflects that Mrs. Tavel–Lipnick acted as her mother's *de facto* personal guardian after her mother's stroke. Mrs. Tavel–Lipnick oversaw her mother's care at Ingleside. As her mother's ability to eat declined, the staff at the nursing home suggested that Mrs. Tavel–Lipnick permit doctors to implant a feeding tube into her mother's stomach. Mrs. Tavel–Lipnick gave her permission.

On March 27, 1992, doctors surgically implanted the feeding tube into Mrs. Tavel. Mrs. Tavel–Lipnick testified that she was distraught at the time. She also testified she was pressured into agreeing to permit the implantation of the feeding tube.

On May 15, 1992, the Court of Chancery appointed Mrs. Tavel–Lipnick as the legal guardian of her mother's person. The order of appointment included the following provision:

> The guardian of the person shall be authorized to make any and all decisions regarding the medical care of Charlotte F. Tavel including those decisions on whether or not heroic measures should be used should Charlotte F. Tavel's condition worsen to the point that that decision needs to be made.

Mrs. Tavel's condition progressively deteriorated after the stroke in January 1992. At times, she was observed tugging at her feeding tube and on two occasions she removed the tube. A mitt was placed on her right hand to prevent her from further displacing the tube.

Based on the belief that her mother would not want to continue existing under the present circumstances, Mrs. Tavel–Lipnick petitioned the Court of Chancery in November 1994 for authorization to remove the feeding tube from her mother so that she may be allowed to die. Mrs. Tavel is presently ninety-two years old and is still being cared for at Ingleside.[1] It has been approximately three and a half years since her stroke, during which time her condition has steadily and continually declined. She suffers from, among other things, seizures, skin ulcers and incontinence. She is non-communicative and cannot control her bodily functions. Doctors predict that there is no chance for her to recover and that her life expectancy is very short.

### Court of Chancery Hearing

It is undisputed that Mrs. Tavel never executed a "living will" that expressed, in the event of her incapacity, her wishes concerning life-sustaining treatment. Accordingly, the Court of Chancery conducted an evidentiary hearing with regard to Mrs. Tavel–Lipnick's petition to remove the feeding tube from her mother. The hearing took place on March 3, 1995.

At the hearing, Mrs. Tavel–Lipnick presented the testimony of several friends and acquaintances of Mrs. Tavel in support of her petition. Mrs. Tavel–Lipnick also presented the testimony of Alan J. Fink, M.D. ("Dr. Fink") concerning her mother's present condition and her future prognosis. The attorney ad litem joined Mrs. Tavel–Lipnick in her petition. In opposition to Mrs. Tavel–Lipnick's petition, the State presented the testimony of Italo V. Monteleone, M.D. ("Dr. Monteleone").

Mrs. Tavel–Lipnick's first witness, Rabbi Peter H. Grumbacher ("Rabbi Grumbacher"), testified that he had been Mrs. Tavel's rabbi and close friend since 1972. He had periodically visited Mrs. Tavel in the nursing home after her stroke. He said that during none of his visits had Mrs. Tavel ever appeared to relate or respond to him.

Rabbi Grumbacher depicted Mrs. Tavel, before the stroke, as a vivacious, charming and funny woman, who possessed a deep faith in her religion. Although he admitted that Mrs. Tavel had never expressed her wishes to him regarding life-sustaining treatment, Rabbi Grumbacher believed, in view of Mrs. Tavel's concerns about her appearance and the quality of her life, that she would not have wanted the feeding tube implanted in the first place, and would now want it removed. He indicated that removing the feeding tube to permit Mrs. Tavel to die would be consistent with the tenets of Reform Judaism.

Florence Drooz ("Mrs. Drooz") testified that she and Mrs. Tavel had been close friends for a very long time. She had visited Mrs. Tavel twice a week in the nursing home since her stroke. Mrs. Drooz related that on her first visits to the nursing home, Mrs. Tavel would appear to respond to her by

---

1. Ingleside is aware of these proceedings and, by its attorney, notified this Court that it would not be participating in this appeal.

speaking incoherently, but that for the past six months to a year she had observed no response from Mrs. Tavel whatsoever. Mrs. Drooz believed, based on her understanding of Mrs. Tavel's friendly and outgoing nature, that Mrs. Tavel would not have wanted to live under the present circumstances in which she is incapable of communicating.

Dorothy Beulah ("Ms. Beulah") testified that she had worked for Mrs. Tavel for six years. She quoted Mrs. Tavel as once stating, "I hope I will never get sick and just linger. . . ." Ms. Beulah admitted that Mrs. Tavel's statement had been vague. Ms. Beulah also acknowledged that Mrs. Tavel had never expressly discussed life-sustaining treatments with her.

Mrs. Tavel–Lipnick testified that her mother was the strongest person she had ever known. She asserted that her mother was a "person who needed to be in control and was always in control of everything." She had no doubt that her mother would have wanted the feeding tube removed because:

[she] would never want to be dependent on anybody for anything that way. My mother would not want to have this invasive thing in her; I mean this tube forcing food into her that she can't even enjoy. She would hate that, because she loved good food. . . . She loved life, my mother. She was just a very vital person. This would be like . . . a nightmare for her.

Mrs. Tavel–Lipnick further testified that her mother had made her promise never to let her become helpless and dependent like people they had visited in nursing homes. Mrs. Tavel–Lipnick recalled that she and her mother had at one time discussed Dr. Kevorkian and euthanasia. She testified that her mother had approved of Dr. Kevorkian's actions in assisting seriously ill people commit suicide, specifically referring to his actions as "a blessing."

Mrs. Tavel–Lipnick had initially visited her mother every day at Ingleside but had subsequently reduced the visits to three times a week. She said that her mother had appeared to recognize and respond to her at first, but that her mother had not responded to her for "a long time." She said that sometimes when she called her mother's name, her mother would open her eyes but did not appear to see her. Mrs. Tavel–Lipnick testified that her mother had no property and that there was no question of an inheritance.

Jimmy D. Harrington, R.N. ("Mr. Harrington"), had supervised the nursing care for Mrs. Tavel since September 1, 1993. He testified that when he first began to care for Mrs. Tavel, she appeared to respond to him and that sometimes she would squeeze his hand at his request. When he called her name, he stated that Mrs. Tavel would open her eyes and that her eyes appeared to follow him around the room.

In Mr. Harrington's opinion, Mrs. Tavel was initially "somewhat communicative, although her speech was distorted and her words were incoherent." Mr. Harrington testified that Mrs. Tavel's condition had progressively deteriorated since he began caring for her. He acknowledged that he had not heard her speak for nine or ten months and that her general responsiveness had diminished significantly.

As to her physical condition, Mr. Harrington indicated that Ms. Tavel could not move in her bed but that she could sit in a chair if a nurse placed her there. Mrs. Tavel had no ability to move her left side but Mr. Harrington had witnessed some spontaneous movements on her right side. He testified that Mrs. Tavel suffers from an intermittent persistent cough, seizures, blisters, edema, ulcers and pallor. Recently, Mr. Harrington recounted that Mrs. Tavel had experienced episodic periods of vomiting and had lost a significant amount of weight.

Dr. Fink, a neurologist, examined Mrs. Tavel and offered his assessment at the hearing. Dr. Fink opined that Mrs. Tavel's stroke had left her in a "coma vigil," a form of persistent vegetative state in which the patient has no ability to perceive or to respond. He defined a coma vigil as a "fixed neurological state where the brain is so irreparably damaged that the patient is actually in a coma, but they appear to be awake." Dr. Fink testified that Mrs. Tavel had become permanently quadriparetic, meaning

that she had permanently lost the use of her four limbs. In Dr. Fink's view, Mrs. Tavel had no hope of ever recovering.

Because a patient in a coma vigil appears to be awake, Dr. Fink explained that people are often misled into believing that the patient's random eye movements signify that the patient is alert and responsive. Furthermore, Dr. Fink testified that a patient in a coma vigil retains the ability to exhibit some reflexive actions, such as grasping or squeezing. Dr. Fink believed that Mrs. Tavel's condition would not cause her death directly but that, in any event, her life expectancy was only six months to a year.

Dr. Fink testified that the removal of Mrs. Tavel's feeding tube would cause her to become dehydrated and to starve. He predicted that she would probably die from "natural causes" within ten to fourteen days after the feeding tube was withdrawn. Dr. Fink testified that Mrs. Tavel would not suffer any pain during that period, however, because Mrs. Tavel's condition left her unable to experience emotion or feeling.

The State's expert witness was Dr. Monteleone, a retired neurologist. In Dr. Monteleone's medical opinion, Mrs. Tavel was not in a persistent vegetative state because her kidneys continued to function, her breathing was normal and because she could open and close her eyes. Dr. Monteleone testified that he believed Mrs. Tavel was still capable of some movement because he had pinched her toe and she had moved her leg in response.

Dr. Monteleone agreed with Dr. Fink that Mrs. Tavel had no chance for recovery and that her life expectancy was from six months to a year. Dr. Monteleone disagreed with Dr. Fink's assertion that Mrs. Tavel would not suffer any pain if the feeding tube was withdrawn. He stated that it was impossible to tell whether a person in Mrs. Tavel's condition would or would not suffer pain. Dr. Monteleone admitted that he was morally and ethically opposed to the removal of the feeding tube. He acknowledged that his religious beliefs played a part in his medical opinion.

### Court of Chancery Decision

The Court of Chancery concluded that Mrs. Tavel was in a persistent vegetative state. The Court of Chancery found Dr. Fink's testimony persuasive as to Mrs. Tavel's condition, in part, because he had relied on respected medical authorities. The Court of Chancery noted that his opinion concerning the effect of withdrawing the feeding tube was consistent with the ethical standards adopted by the American Medical Association. It was not persuaded by Dr. Monteleone's testimony because he had not relied on medical authorities and because, in the Court of Chancery's view, Dr. Monteleone's opinion primarily reflected his belief that a physician has a moral duty to provide nutrition under all circumstances.

The Court of Chancery held that Mrs. Tavel–Lipnick was required, under the "substituted judgment" standard, to prove through clear and convincing evidence that her mother would have wanted the tube removed. The Court of Chancery found that the testimony of Mrs. Tavel–Lipnick, combined with the testimony of Mrs. Tavel's close friends, provided clear and convincing evidence that Mrs. Tavel would have wanted the feeding tube removed. The Court of Chancery found no reason to discredit the witnesses' testimony, particularly because Mrs. Tavel had no property and there was no question of ulterior motives.

After reviewing the evidence, the Court of Chancery granted Mrs. Tavel–Lipnick's petition to remove the feeding tube. The Court of Chancery found that Mrs. Tavel–Lipnick had presented clear and convincing evidence that her mother was in a persistent vegetative state and that her mother, if she had been capable of communicating her wishes, would have wanted the feeding tube removed.

### DEATH WITH DIGNITY ACT LEGISLATIVE INTENT NON–EXCLUSIVE

██ In this appeal, the State contends that medical treatment and life support may be withheld or withdrawn from an incompetent person *only* if that individual has execut-

ed a written advance declaration in accordance with the Delaware Death With Dignity Act. 16 *Del.C.* § 2501 *et seq.* The Delaware Death With Dignity Act was adopted in 1982. It recognizes the right of a competent adult to refuse treatment. In furtherance of that right, the Death With Dignity Act authorizes the execution of an advance written declaration by a competent adult directing the withholding or withdrawal of medical treatment and life support, in certain circumstances, after the declarant becomes incompetent.

The synopsis to the Death With Dignity Act reflects that it was a legislative response to this Court's decision in *Severns v. Wilmington Medical Center, Inc.,* Del.Supr., 421 A.2d 1334 (1980) (hereinafter *"Severns I"*). That synopsis states:

> Mary R. Severns was so severely injured in an automobile accident in December, 1979 that all medical science could do was to continue certain primitive life functions. Mrs. Severns had, for years, stated that she would like to make a "living will;" and that she did not want to be kept alive as a vegetable, or by extraordinary means. Unfortunately, legislation to permit her to make a "living will" had not been enacted; and she was, in fact, finally subjected to the type of "artificial life" that she feared. Because there was no living will, the medical and legal expenses borne by the surviving family members have been enormous. In its decision, the Delaware Supreme Court stated:

>> "Contemplated actions or inactions which are expected to determine whether a person lives or dies, plainly, should be authorized or conditioned or barred, as the case may be, by the General Assembly ... given the community values at stake, specific action by the General Assembly is most desirable." *(Severns v. Wilmington Medical Center, Inc.,* 421 A.2d 1334).

> This Act provides the authority for a person to make a living will. Although it is also known as "death with dignity" legislation, it is not the intent of this Act to define or determine a state of death. This Act would permit an adult to explicitly state his or her desires regarding medical treatment, through the execution of a legal document, in the event he or she is diagnosed as having a terminal condition. It establishes a simple and easily-administered process which serves to protect the patient's right to medical self-determination by allowing the patient to reject unwanted medical treatment that only prolongs dying, and causes needless suffering.

> Under the provisions of this Act procedures are established for executing the document, many of which are similar to procedures to the execution of a will (hence the term, "living will"). The document only becomes operative if the person has been diagnosed as having a terminal condition by two physicians, and there is a clear need for a treatment decision regarding maintenance medical treatment. Both the terms "terminal condition" and "maintenance medical treatment" are defined within the Act. The Act would *not* permit the withholding or withdrawal of ordinary medical procedures which serve to provide comfort to the patient, or to alleviate pain. This is specified in at least two sections of the Act.

> It is not the intent of this legislation to force all persons to be involved with a "living will." Under this Act a person who wishes to prepare for the possible situation where he might not wish to continue with procedures or medications which may be painful or expensive, may do so. The only persons affected by this Act are those who voluntarily and affirmatively take advantage of its provisions; and even then the Act is effective only as directed in such person's Declaration.

The foregoing synopsis to the Death With Dignity Act states unequivocally that the Act was not intended to affect the rights of persons who do not choose to take advantage of its provisions. The discretionary phraseology of the statute itself is consistent with the statements in the synopsis. *See* 16 *Del.C.* § 2502(b) (*"may* appoint an agent ...") and 16 *Del.C.* § 2503(a) (*"may* execute a declaration ...").

The non-exclusive nature of the Death With Dignity Act was reiterated by the General Assembly in 1993, when the Delaware

guardianship statute was revised in its entirety. 12 *Del.C.* § 3901 *et seq.*[2] The 1993 revisions to Delaware's guardianship laws eliminated many of the ambiguities of the prior statutes that this Court had identified in *Severns I.* *Severns I,* 421 A.2d at 1345. In particular, the 1993 revisions included specific standards for guardians of the person to use in making "substituted judgments" for their incompetent wards concerning medical care.

■ In this proceeding, based on the foregoing analysis, the Court of Chancery determined that the General Assembly did not intend the Death With Dignity Act to be the *exclusive* method for deciding whether to withhold or withdraw medical treatment and life support from an incompetent person. That conclusion is affirmed. The next logical question is how are such decisions to be made in the absence of an incompetent person's prior compliance with the Death With Dignity Act?

## RIGHT OF SELF–DETERMINATION
## SUBSTITUTED JUDGMENT
## FOR INCOMPETENT

More than a century ago, the United States Supreme Court recognized that no "right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his [or her] own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed.

734 (1891). The foregoing principle is one of the unalienable rights of life and liberty described in the Preamble to the Declaration of Independence. *Cf. Severns I,* 421 A.2d at 1344. The preservation of that common law right of self-determination has been implemented by the Fifth Amendment to the United States Constitution and Article I, § 7 of the Delaware Constitution.

■ A competent person's constitutional right of self-determination cannot be eliminated by statute. Del. Const. art. I, § 9. This Court has recognized that the constitutional right of self-determination is not lost when an individual becomes incompetent. *Severns I,* 421 A.2d at 1347; *see also In re Jobes,* Supr., 108 N.J. 394, 529 A.2d 434 (1987). Therefore, an incompetent person does not lose his or her right to withhold or withdraw life-sustaining treatment. *Severns I,* 421 A.2d at 1347.

■ To give effect to an incompetent person's rights, this Court has held that the guardian of the person has standing to invoke and vicariously assert the constitutional right of an incompetent ward to accept medical care or to refuse it. *Id.* The term "substituted judgment" is commonly used to describe that process. *In re Jobes,* 529 A.2d at 450. The purpose of the "substituted judgment" doctrine is to ensure that the surrogate decisionmaker effectuates the decision that the incompetent patient would have made if he or she were competent.

Under the substituted judgment doctrine, where an incompetent's wishes are not

2. In pertinent part, the general powers and duties of the guardian of the person are now set forth, as follows:
 (a) The Court [of Chancery] shall grant to the guardian of the person such powers, rights and duties which are necessary to protect, manage and care for the disabled person. The Court [of Chancery] may at any time change the powers of the guardian of the person.
 (b) The guardian of the person may exercise the same powers, rights and duties respecting the care, maintenance and treatment of the disabled person that a parent has respecting his unemancipated minor child, except that the guardian of the person is not liable to third persons for acts of the disabled person solely by reason of the guardianship relationship. Except as modified by the order of guardian-

ship and without qualifying the foregoing, a guardian of the person has the following powers and duties:

 (3) The guardian may give such consent or approval as may be necessary to enable the disabled person to receive medical or other professional care, counsel, treatment or service and shall have power to authorize release of medical records. The guardian shall not unreasonably withhold such consent or approval nor withhold such consent or approval on account of personal beliefs held by the guardian or the disabled person, but shall take such action as he objectively believes to be in the best interest of the disabled person.
12 *Del.C.* § 3922.

clearly expressed, a surrogate decision-maker considers the patient's personal value system for guidance. The surrogate considers the patient's prior statements about and reactions to medical issues, and all the facets of the patient's personality that the surrogate is familiar with—with, of course, particular reference to his or her relevant philosophical, theological, and ethical values—in order to extrapolate what course of medical treatment the patient would choose.

*Id.*

■ When a person has clearly expressed his or her prior intentions about a course of treatment in the event of incompetency, those intentions should be respected. *See Cruzan v. Director, Mo. Dept. of Health,* 497 U.S. 261, 289–90, 110 S.Ct. 2841, 2857–58, 111 L.Ed.2d 224 (1990) (O'Connor, J., concurring opinion). As Justice O'Connor noted, however: "few individuals provide explicit oral or written instruction regarding their intent to refuse medical treatment should they become incompetent." *Id.* at 289, 110 S.Ct. at 2857. Similarly, the Wisconsin Supreme Court noted that:

> [r]elatively few individuals provide explicit written or oral instructions concerning their treatment preferences should they become incompetent. The reasons for this are undoubtedly myriad: ignorance, superstition, carelessness, sloth, procrastination or the simple refusal to believe it could happen to oneself. This failure to act is not a decision to accept all treatment, nor should society's increasing ability to prolong the dying process make it one.

*In re Guardianship of L.W.,* Supr., 167 Wis.2d 53, 482 N.W.2d 60, 67–68 (1992). When an incompetent person has not expressed his or her intentions regarding the withholding or withdrawal of treatment in accordance with a statutory formality, the "substituted judgment" by the guardian of the person best accomplishes the goal of having the ward make his or her own decision. *See Severns I,* 421 A.2d at 1347; *In re Jobes,* 529 A.2d at 451.

## SUBSTITUTED JUDGMENT CLEAR AND CONVINCING EVIDENCE

■ The Court of Chancery appointed Mrs. Tavel–Lipnick to be the guardian for the person of her mother, Mrs. Tavel, before the 1993 revisions to the Delaware guardianship statute. The Court of Chancery authorized her to exercise powers appropriate to the circumstances. *See Severns I,* 421 A.2d at 1345. The order appointing Mrs. Tavel–Lipnick as guardian included the following authority:

> The guardian of the person shall be authorized to make any and all decisions regarding the medical care of Charlotte F. Tavel including those decisions on whether or not heroic measures should be used should Charlotte F. Tavel's condition worsen to the point that that decision needs to be made.

Notwithstanding the general authority to make decisions with regard to Mrs. Tavel's medical treatment, Mrs. Tavel–Lipnick filed the petition which is the subject of this appeal. Apparently, Mrs. Tavel–Lipnick was uncertain whether the insertion of the feeding tube or its withdrawal constituted a form of medical treatment governed by the order appointing her as guardian. *See Severns I,* 421 A.2d at 1345.

The majority of jurisdictions have held that removal of an artificial feeding tube is not a "death producing agent." *McConnell v. Beverly Enterprises–Conn., Inc.,* Supr., 209 Conn. 692, 553 A.2d 596, 605 (1989). These jurisdictions have determined that, upon removal of an artificial feeding tube, death will result from the underlying disease or ailment, not from the removal.[3] *Id.; see In re Gordy,* Del.Ch., 658 A.2d 613, 615 n. 1 (1994) (citing Robert M. McCann et al., *Comfort Care for Terminally Ill Patients: The Appropriate Use of Nutrition and Hydration,* 272 JAMA 1263 (1994)).

Subsequent to our decision in *Severns I,* the majority of the United States Supreme Court, in *Cruzan,* held that the Due Process Clause of the Fourteenth Amendment establishes a "liberty interest" that "would grant a

---

**3.** As noted previously, Dr. Fink testified that, if the feeding tube was removed from her stomach,

Mrs. Tavel's death would result from natural causes.

competent person a constitutionally protected right to refuse [medical treatment, including] lifesaving hydration and nutrition." *Cruzan v. Director, Mo. Dept. of Health,* 497 U.S. at 279, 110 S.Ct. at 2852. Justice O'Connor further noted in her concurrence that:

> Artificial feeding cannot readily be distinguished from other forms of medical treatment.... A gastrostomy tube ... must be surgically implanted in the stomach or small intestine.... Requiring a competent adult to endure such procedures against her will burdens the patient's liberty, dignity, and freedom to determine the course of her own treatment. Accordingly, the liberty guaranteed by the Due Process Clause must protect, if it protects anything, an individual's deeply personal decision to reject medical treatment, including the artificial delivery of food and water.

*Id.* at 288–89, 110 S.Ct. at 2857 (O'Connor, J., concurring opinion).

The majority opinion in *Cruzan* also recognized that even for competent individuals "determining that a person has a 'liberty interest' under the Due Process Clause does not end the inquiry; 'whether respondent's rights have been violated must be determined by balancing his liberty interests against the relevant state interests.'" *Id.* (quoting *Youngberg v. Romeo,* 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982)). The Court acknowledged that competent persons may generally refuse medical treatment even at the risk of death, because the "right to self-determination ordinarily outweighs any countervailing state interests...." *Id.* at 273, 110 S.Ct. at 2848.[4] Nevertheless, the Court concluded that, in determining the proper balance between those competing interests after a person becomes incompetent, "a State *may* apply a

clear and convincing evidence standard in proceedings where a guardian seeks to discontinue nutrition and hydration of a person diagnosed to be in a persistent vegetative state." *Id.* at 284, 110 S.Ct. at 2854 (emphasis added).

This Court has held that the clear and convincing standard of evidentiary proof is applicable in judicial proceedings involving the termination of parental rights. *See In re Stevens,* Del.Supr., 652 A.2d 18 (1995). Likewise, that standard has also been applied to other civil proceedings involving the termination of important rights.[5] *See Newmark v. Williams,* Del.Supr., 588 A.2d 1108 (1991); *William H.Y. v. Myrna L.Y.,* Del.Supr., 450 A.2d 406 (1982); *see also Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). We hold that the Court of Chancery was correct to apply the clear and convincing standard to this case involving issues concerning Mrs. Tavel's right to withhold or withdraw treatment.[6]

 After applying the clear and convincing standard, the Court of Chancery concluded that the "petitioner ha[d] proven by clear and convincing evidence that Mrs. Tavel would not want the life-sustaining feeding tube if she were competent to make that decision for herself." *Accord In re Gordy,* 658 A.2d at 619. The Court of Chancery's conclusion is supported by the factual record and is also the product of a logical deductive process. Accordingly, that conclusion is affirmed. *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671 (1972).

## INDEPENDENT ADVOCATE ATTORNEY *AD LITEM'S* ROLE

 The State's final argument in this appeal is that it was error for the Court of

---

4. In *Cruzan,* it was recognized that the "informed consent doctrine has become firmly entrenched in American tort law." *Cruzan v. Director, Mo. Dept. of Health,* 497 U.S. at 269, 110 S.Ct. at 2847. The Court also noted the logical corollary of the doctrine of informed consent is the right to withhold consent by refusing treatment. *Id.* at 270, 110 S.Ct. at 2847.

5. The clear and convincing standard is an intermediate evidentiary standard, higher than mere

preponderance, but lower than proof beyond a reasonable doubt. *In re Rowe,* Del.Jud., 566 A.2d 1001, 1006 (1989).

6. Due to the limited nature of the stipulated facts with regard to questions this Court accepted for certification in *Severns I,* this Court did not previously address the question of the appropriate standard of proof to apply in withdrawing medical treatment cases.

Chancery to have permitted the attorney *ad litem* to join with Mrs. Tavel–Lipnick in her petition to withdraw the feeding tube from Mrs. Tavel. The State contends that the attorney *ad litem*'s role should have been to oppose the guardian's petition, so that the Court of Chancery would receive the benefits of a thorough and full adversarial presentation. Moreover, to the extent the Attorney General was required to undertake this role, the State contends it is entitled to recover court costs.

In *Wilmington Medical Center, Inc. v. Severns*, Del.Supr., 433 A.2d 1047 (1981) (hereinafter "Severns II"), this Court held that, in cases where a guardian has petitioned for the termination of life support, the Court of Chancery has a duty to provide an attorney *ad litem* on behalf of the disabled person. We held that the attorney *ad litem* must be "independent" and must "act for the proposed ward during the proceeding." *Severns II*, 433 A.2d at 1049. Court of Chancery Rule 176(a) defines the role of the attorney *ad litem* as follows:

> Upon the filing of the petition, the Court shall appoint a member of the Delaware Bar to represent the adult person alleged to be disabled if such person is not otherwise represented by counsel, to receive notice on behalf of such person and to give actual notice to such person, explain his or her rights, and the nature of the proceeding. The attorney *ad litem* shall represent the person alleged to be disabled *as if engaged by such person*.

Ch.Ct.R. 176(a) (emphasis added). The language of the attorney *ad litem* rule provides great latitude to the attorney *ad litem* to determine the position he or she will advocate. The broad language of that rule, providing that the attorney *ad litem* should "represent the person as if engaged by such person," clearly does not limit the attorney *ad litem* to opposing whatever position the guardian takes.

In *Severns II*, this Court acknowledged that it is proper for the attorney *ad litem* to either oppose or join the guardian's petition. Therefore, if the attorney *ad litem*, after careful, independent review, determines that the disabled person he or she represents would have refused or terminated medical treatment, the attorney *ad litem* may advocate such a position. Similarly, should such investigation indicate that the disabled person would have opposed efforts to terminate his or her life, the attorney *ad litem* is obligated to oppose the guardian's petition. Thus, in *Severns II*, this Court stated that the attorney *ad litem*'s "right to compensation should not necessarily be determined by the position he takes in the litigation." *Severns II*, 433 A.2d at 1050.

This Court and the Court of Chancery were greatly assisted by the manner in which the Attorney General framed and argued the issues in this proceeding. We recognize the force of the State's argument that if the attorney *ad litem* joins the guardian's petition, the Court of Chancery will not be presented with an adversarial proceeding, with the enhanced guarantee of accurate factfinding that such a proceeding brings with it. Nevertheless, in *Cruzan*, the Supreme Court noted that the attorney *ad litem* "may act in entire good faith, and yet not maintain a position truly adversarial to that of the family." *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 282 n. 9, 110 S.Ct. 2841, 2853 n. 9, 111 L.Ed.2d 224 (1990). Consequently, in part because a treatment termination proceeding may properly be non-adversarial, the Court determined in *Cruzan* that the United States Constitution permitted Missouri to adopt a "clear and convincing" evidentiary standard of proof.

Similarly, in Delaware, because there is no requirement that a treatment termination proceeding be adversarial, we hold that the trial court is required to determine if there is clear and convincing evidence of both the ward's physical condition and of the decision that the ward would have made if he or she were competent. If the attorney *ad litem* joins in the guardian's petition and the trial court concludes, for any reason, that it would benefit from an adversarial presentation, it may appoint a "life advocate" to oppose the petition. *See In re Jobes*, Supr., 108 N.J. 394, 529 A.2d 434, 437 (1987). Un-

like the attorney *ad litem,* the "life advocate" would not be bound to represent the ward "as if engaged by the ward."

The record reflects that the attorney *ad litem* acted in good faith and properly discharged his role as an independent advocate for the ward, Mrs. Tavel. The Court of Chancery's rulings regarding the issues relating to the attorney *ad litem* are affirmed.

*Conclusion*

The judgment of the Court of Chancery is **AFFIRMED.** The mandate will issue on Tuesday, August 8, 1995, at 4:30 p.m. Supr. Ct.R. 19(a).