**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

PAUL A. FIORAVANTI, JR.
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

March 24, 2026

Lawrence Lee Wentz, Esquire
521 N West St
Wilmington, DE 19801

D.A.M.
[Redacted]

     RE:   *In re J.L.S., a person with an alleged disability*,
              C.M. No. 20912-K-PAF

Dear Counsel, Ms. D.A.M.:

This letter decision memorializes the court's prior oral ruling that denied an emergency petition to change the code status of J.L.S., a person with an alleged disability. J.L.S. died shortly after the court's oral ruling. This decision highlights a conflict between the recently adopted statute governing health-care decisions and the concomitant Court of Chancery Rule.

## I.    BACKGROUND

### A.    The Person with an Alleged Disability

J.L.S. was an 86-year-old individual residing at a hospital facility in Kent County, Delaware.[1] He and his spouse, V.S., had been married for approximately

---

[1] Dkt. 17 ("Emergency Petition") ¶ 1; Dkt. 1 ("Guardianship Petition") ¶¶ 1, 3(c), 3(e)(i)−(ii).

46 years. Their family included two adult sons from V.S.'s prior marriage.[2] On April 18, 2024, J.L.S. was admitted to the [Redacted] (the "Hospital").[3] Until that time, he resided in Delaware with his spouse and one of his stepsons, M.M.[4]

### B. Factual Background

#### 1. Medical history and J.L.S.'s capacity preceding the guardianship

On April 18, 2024, J.L.S. was admitted to the Hospital after being diagnosed with dehydration and pneumonia.[5] This marked the fourth time that J.L.S. had been hospitalized in 2024.[6] He had reportedly been bedridden for approximately six months, and his medical history included lymphoma and bilateral knee arthritis.[7]

On April 23, 2024, Nurse Practitioner R.M. provided approximately 94 minutes of combined face-to-face and non-face-to-face care to J.L.S.[8] During that visit, V.S. stated she did not believe that she could care for her husband at home, even with hospice support.[9] R.M.'s notes reflect potential uncertainty regarding end-

---

[2] Emergency Petition Ex. B.

[3] *Id*. ¶ 1; Guardianship Petition ¶¶ 1, 3(c), 3(e)(i)−(ii).

[4] Guardianship Petition ¶ 4(c).

[5] *Id.* ¶ 3(e)(iv); *id.* Ex. B.

[6] Emergency Petition Ex. B.

[7] *See* Emergency Petition Exs. B, E.

[8] *Id*. Ex. B.

[9] *Id.*

of-life care. One entry indicates that J.L.S. said that he had been "ready to die, when it's his time."[10] V.S., however, expressed that she wanted her husband "to try to participate with therapy if possible."[11] Both were described as favoring avoidance of "aggressive, or artificial measures to prolong [J.L.S.'s] life."[12]

At the same time, the medical record listed J.L.S.'s code status as "full code"[13] and included a statement attributed to him that "[he] just can't die."[14] But when

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] "A full code or code blue involves calling a rapid response team and initiating appropriate treatment as quickly and effectively as possible with the goal of reversing an adverse event, returning patients to the status they had before the event that triggered the full code and restoring as high a level of functioning as possible. It is an emergency intervention with high priority, and speed is often critically important. A full code, properly executed, is often life-saving." Forman & Ladd, *Why Not a Slow Code?*, 14 AMA J. Ethics 759, 760 (2012). "'[F]ull code' represents a patient's request for a physician to use any clinically indicated medical intervention(s) to save that patient's life." Simon J.W. Oczkowski *et al.*, *Withdrawing versus not offering cardiopulmonary resuscitation: Is there a difference?*, 22 Can. Respir. J. 20 (2015); *see also* Kim Jordan et al., *Associations with resuscitation choice: Do not resuscitate, full code or undecided*, 99 Patient Educ. Couns. 823, 824 (2016) ("In [the] absence of a D[o] N[ot] R[esuscitate] order, the individual by default is 'full resuscitation', often termed 'full code' (FC), and will undergo endotracheal intubation, assisted ventilation, chest compressions, defibrillation, and cardiotonic drugs when appropriate."); *Hamilton v. Negi*, 2014 WL 1388260, at *4 n.6 (W.D. La. Mar. 31, 2014) ("Full code" "means a patient is to receive all resuscitative measures, which can include nutritional support, intubation, and/or chest compressions, in end-of-life situations."), *aff'd*, 595 F. App'x 346 (5th Cir. 2014).

[14] Emergency Petition Ex. B.

asked specifically about resuscitation, he stated, "I don't want it, let me go!"[15] The record further reflects that J.L.S. described himself as "miserable" with his quality of life because of immobility and knee pain and that he "just want[ed] to sleep and eat."[16] The April 23 assessment anticipated that J.L.S. would "likely progress to end-of-life within . . . 6 months."[17] According to the record, J.L.S. was forgetful, but demonstrated some insight into his medical condition and wishes.[18]

On April 24, 2024, R.M. met again with J.L.S. and V.S. for 80 minutes to review goals of care.[19] During that meeting, J.L.S. completed a Delaware Medical Orders for Scope of Treatment form (the "DMOST"). The executed DMOST reflects that J.L.S. declined resuscitation, intubation, mechanical ventilation, and artificial nutrition.[20] The record of the April 24 visit indicated that J.L.S. was considered "medically stable for discharge," but his wife reiterated that she could not provide care for him at home.[21]

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] Emergency Petition Ex. C.

[20] *See* Dkt. 15 Ex. at 1.

[21] Emergency Petition Ex. C.

On May 21, 2024, J.L.S. experienced an episode of supraventricular tachycardia.[22] He was treated with, and responded to, adenosine.[23] Several months later, on October 25, 2024, Dr. M.A. documented that J.L.S. required high-complexity medical decision-making because he was "critically ill due to atrial tachycardia with hypotension."[24] J.L.S. was admitted to the intensive care unit that day. According to the medical record, J.L.S. "changed his code status [from Do Not Resuscitate ('DNR')] to full code and had capacity to make th[at] decision."[25] The same record shows that he received three 6 mg doses of adenosine that day during a rapid response event for supraventricular tachycardia and hypotension.[26]

### 2. The guardianship proceedings

On June 27, 2025, the Hospital filed a petition to appoint a guardian for J.L.S. (the "Guardianship Petition").[27] The Guardianship Petition indicated that J.L.S. suffered from "severe cognitive impairment affecting orientation, capacity for medical decision making, recall, and attention with diminished language

---

[22] Emergency Petition Ex. E.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Dkt. 1. As is typical with most guardianship petitions, the matter was assigned to a Magistrate in Chancery.

processing."[28]  The petition was supported by an affidavit from M.R.M., D.O. (the

"M.R.M. Affidavit").[29]  The M.R.M. Affidavit described a June 19, 2025 evaluation

that included a Mini-Mental State Examination ("MMSE").  J.L.S. scored 15 out of

30 on the MMSE, which was characterized as "abnormal" and indicative of "severe

cognitive impairment."[30]

The M.R.M. Affidavit noted that J.L.S. suffered from sensorineural hearing

loss and described aspects of his cognitive functioning.  According to the M.R.M.

Affidavit, J.L.S. was able to identify the season, month, state, country, town, and

Hospital location; name common objects (*i.e.*, a pencil and a watch); follow a multi-

step command ("Take a paper in your hand, fold it in half, and put it on the floor");

read and comply with the instruction ("Close your eyes"); and write a sentence.[31]

He was unable, however, to identify the year, date, and day; spell "world"

backwards; recall previously stated words ("pin, fork, and bottle"); or repeat the

---

[28] Guardianship Petition ¶ 10; *see also* M.R.M. Aff. (Dkt. 1) at 2−3 (reporting cognitive impairment following a 45-minute visit on June 19, 2025).

[29] M.R.M. Aff. at 2.

[30] *Id.*

[31] *Id.* at 4.

phrase "No ifs, ands, or buts."[32]  The M.R.M. Affidavit also indicates that J.L.S. was unable to copy a displayed design.[33]

The Guardianship Petition and the M.R.M. Affidavit stated that J.L.S. was "unable to perform activities of daily living, [] require[d] total care,"[34] and that his condition impaired his "medical decision-making" capacity.[35]  The Hospital represented that it filed the Guardianship Petition because V.S. had been unwilling to assist with applying for Medicaid long-term care benefits or arranging for J.L.S. to return home.[36]  The Guardianship Petition identified D.A.M., a geriatric care manager at [Redacted] (the "Guardian"), as proposed guardian of the person and property.[37]

On July 21, 2025, the Magistrate appointed an attorney *ad litem* (the "Former AAL") to represent J.L.S.'s best interests.[38]  On August 7, 2025, the Former AAL connected with J.L.S. for a video call using FaceTime.[39]  J.L.S. was resistant to

---

[32] *Id.*

[33] *Id.*

[34] Guardianship Petition ¶ 10; *see* M.R.M. Aff. at 3.

[35] M.R.M. Aff. at 2.

[36] Guardianship Petition ¶ 10.

[37] *Id.* ¶ 11; *see also* Guardian Consent (Dkt. 1).

[38] Dkt. 2 ¶ 2.

[39] Dkt. 3 (hereinafter "AAL's Letter") ¶ 2.

engaging with the Former AAL, and he consistently and unequivocally objected to the appointment of a guardian. The Former AAL noted that J.L.S. had shown some awareness of the proceedings and expressed a desire that his wife act as his agent.[40] The Former AAL also described J.L.S. as agitated during the interaction.[41]

On August 12, 2025, the Magistrate informed J.L.S. by letter that, if he remained opposed to the Guardianship Petition, he needed by September 12, 2025 to retain counsel, submit a written objection, or contact the court to request the appointment of counsel.[42] In the absence of any action, the Magistrate would hold a guardianship hearing on September 19, 2025.[43]

On August 22, 2025, the Former AAL filed a four-page written report (the "AAL Report").[44] In the AAL Report, the Former AAL recounted her second attempt to meet with J.L.S. via videoconference on August 13, 2025. According to the AAL Report, J.L.S. was very agitated, began singing, and made noises that appeared intended to drown out communication; he "emphatically [did] not want to

---

[40] AAL's Letter at 2.

[41] *Id.*

[42] Dkt. 5 at 2.

[43] *Id.*

[44] Dkt. 6.

discuss his situation and reiterate[d] that '[his] wife [wa]s [his] agent.'"[45] The Former AAL further reported that she had written to V.S. and M.M., but received no response. The Former AAL concluded that J.L.S.'s circumstances "require[d] resolution and [] long-term placement" which could not occur without the appointment of a guardian because J.L.S.'s family appeared unwilling or unable to assist him.[46]

On September 2, 2025, V.S. contacted the Register in Chancery and objected to the appointment of a fee-for-service guardian of the property, but did not object to the appointment of a guardian of the person.[47] The Register's office provided V.S. with a cross-petition and set a deadline of September 13, 2025 for its submission.[48]

V.S. did not file a cross-petition or objection, and at a hearing on September 19, 2025, the Magistrate appointed the Guardian of J.L.S.'s person and property.[49]

---

[45] *Id.* ¶ 2.

[46] *Id.* ¶¶ 2−3, 7. The Former AAL reported fees totaled $2,145. *Id.* ¶ 9; *see also* Affidavit of Legal Fees (Dkt. 6); Affidavit of Legal Fees Ex. A.

[47] Dkt. 7.

[48] *Id.*

[49] Dkt. 9 at 2.

### 3. Code status developments following the appointment of the Guardian

On January 13, 2026, J.L.S. tested positive for Influenza A.[50] After his condition worsened, J.L.S. was transferred to the intensive care unit on January 15, 2026, where he was started on vasopressors and closer respiratory monitoring. Documentation from that admission by R.M. indicates that J.L.S. was awake, alert, oriented to person and place, and minimally oriented to situation. R.M. also documented that J.L.S. stated his desire to remain full code, consistent with prior code-status discussions.[51]

R.M.'s notes also reflect a conversation with the Guardian's representative, who stated that she had not been informed of the deterioration of J.L.S.'s condition.[52] The Guardian's representative expressed the belief that J.L.S.'s decision for full code status reflected his perception that he was receiving good care and that placement in a long-term care facility was being pursued.[53] The Guardian's representative

---

[50] Dkt. 15 Ex. at 9.

[51] *See id.*

[52] *See id.*

[53] *See id.*

indicated that she would respect J.L.S.'s wishes but requested updates should his condition change.[54]

J.L.S. was transferred out of the intensive care unit on January 24, 2026, but returned two days later and was placed on mechanical ventilation. He remained ventilator-dependent for the ensuing weeks leading up to the filing of the emergency petition.[55]

### 4. The Emergency Petition

On February 2, 2026, the Guardian emailed this court seeking guidance regarding an end-of-life decision for J.L.S. The email acknowledged that J.L.S. had elected full code status in October 2024. The Magistrate responded by letter, indicating that any change in code status would need to be sought by petition pursuant to Court of Chancery Rule 178-A and consistent with 16 *Del. C.* § 2522.[56] The Magistrate also urged the Guardian to consult independent legal counsel regarding available options and further proceedings.

The Guardian did not retain separate counsel for purposes of the emergency petition. Instead, the Guardian's representative conferred with the Hospital's in-

---

[54] *See id.*

[55] Dkt. 17 (the "Emergency Petition") ¶ 1; Emergency Petition Ex. A ¶ 5.

[56] Dkt. 16.

house general counsel, who prepared the emergency petition. Both the Guardian

and the Hospital's counsel have acknowledged that the Hospital's counsel did not

represent the Guardian.

### C. Procedural History

On February 13, 2026, the Guardian filed the emergency petition (the

"Emergency Petition").[57] The Emergency Petition sought authorization for the

Guardian to (i) change J.L.S.'s code status, (ii) withdraw life-sustaining treatment,

(iii) forgo reintubation in the event of respiratory failure, and (iv) transition J.L.S. to

comfort-focused, palliative care.[58] The record does not reflect that the Guardian's

representative had a direct conversation with J.L.S. concerning his code status

following the January 2026 admission to the intensive care unit.

The Emergency Petition was supported by two physician affidavits.

According to the affidavits, each physician independently evaluated J.L.S. on

February 12, 2026 for approximately 10 minutes.[59] Both reported that he was

ventilator-dependent, in shock requiring vasopressors, experiencing cardiac

arrhythmia, and suffering worsening hypoxia secondary to heart failure despite

---

[57] Emergency Petition. On February 13, 2026, the Guardian notified V.S. and M.M. of the Emergency Petition. *Id.* Ex. F.

[58] Emergency Petition 1, ¶¶ 13–14.

[59] Emergency Petition Ex. A.

diuretic therapy. Both physicians recommended withdrawal of mechanical ventilation and transition to comfort-focused palliative care.[60] Neither physician recommended tracheostomy or percutaneous endoscopic gastrostomy ("PEG") placement, citing J.L.S.'s vasopressor dependence, progressive hypoxia, altered mental status, lack of responsiveness to aggressive medical therapy, baseline frailty, and poor quality of life.[61] One of the two physicians further documented profound malnutrition, multi-organ failure, and significant weakness.[62]

On February 14, 2026, the court appointed Lawrence Lee Wentz, Esquire, as attorney *ad litem* (the "AAL") for purposes of the Emergency Petition and requested that he provide an oral report at the hearing and consult with J.L.S.'s family members.[63]

On February 16, 2026, the court held a hearing by videoconference on the Emergency Petition.[64] The court heard testimony from V.S., the Guardian's representative, the AAL, and the two treating physicians, Dr. S.N.M. and Dr. R.G.,

---

[60] *Id.*; S.N.M. Aff. ¶ 6; R.G. Aff. ¶ 6.

[61] S.N.M. Aff. ¶ 9; R.G. Aff. ¶ 9.

[62] S.N.M. Aff. ¶ 11.

[63] Dkt. 19.

[64] Dkt. 21 ("Hearing Judicial Action Form").

who submitted affidavits in support of the Emergency Petition.[65]  When questioned about tracheostomy and PEG placement, the physicians confirmed that J.L.S. was medically eligible for a tracheostomy and that the risks he would face were the same as those faced by other similarly situated patients.[66]  Dr. R.G. testified that J.L.S. was unlikely to improve following a tracheostomy.  In Dr. R.G.'s view, the procedure would have prolonged J.L.S.'s life but would not have improved the quality of life or resulted in a meaningful recovery.[67]

Each witness who testified supported the relief requested in the Emergency Petition.  The court did not hear testimony from R.M., who had interacted with J.L.S. during his April 2024 admission in connection with the DMOST execution and during the January 2026 intensive care unit admission, when she documented his confirmation of full code status.

---

[65] *Id.*  V.S. was only able to join the call by audio.  The court was dismayed in learning that V.S. had not been timely informed that J.L.S.'s condition had deteriorated, that he was transferred to the intensive care unit, and that he had been placed on mechanical ventilation. *Id.*

[66] *Id.* at 1−3.

[67] *Id.* at 3.

The court denied the Emergency Petition at the end of the hearing.[68] Two days later, on February 18, 2026, the court issued a bench ruling articulating the reasoning for denying the Emergency Petition.[69]

## II.   ANALYSIS

### A.   The Court's Authority and the Interaction between 16 *Del. C.* § 2522 and Court of Chancery Rule 178-A

"Among the most difficult questions presented in late twentieth century law are those that arise from the social effects of new health care technologies that extend our ability to sustain life . . . at its last stages;" courts—though "imperfect institutions"—must decide cases "as they are properly presented." *In re Gordy*, 658 A.2d 613, 614 (Del. Ch. 1994). So too here.

Delaware law respects a core principle of human autonomy: "Fundamental to human liberty is the right to autonomy over one's own body, including freedom to choose what medical treatment shall be imposed upon one's body." *In re L.M.R.*, 2008 WL 398999, at *2 (Del. Ch. Jan. 24, 2008); *see also In re A.J.*, 2023 WL 4980719, at *2 (Del. Ch. Mar. 10, 2023). But when an individual cannot exercise that autonomy, the court may be asked to authorize a surrogate decision.

---

[68] *Id.* at 4.

[69] Dkt. 23.

*See Severns v. Wilm. Med. Ctr., Inc.*, 421 A.2d 1334, 1349–50 (Del. 1980). The Court of Chancery has authority to honor that request following an evidentiary hearing. *Id.* at 1349.

In 2024, the General Assembly adopted the Uniform Health-Care Decisions Act of 2023 (the "Act"), amending Title 16 of the Delaware Code. The amendments became effective on September 30, 2025. The Act defines a "health-care instruction" as "a direction, whether or not in a record, made by an individual that indicates the individual's goals, preferences, or wishes concerning the provision, withholding, or withdrawal of health care." 16 *Del. C.* § 2502(14). A later instruction that conflicts with an earlier one revokes the earlier "to the extent of the conflict." 16 *Del. C.* § 2507(c). The Act presumes that an individual has capacity unless that presumption is rebutted pursuant to the statutory mechanism. 16 *Del. C.* § 2504(a)–(b). Capacity requires that "an individual [be] willing and able to communicate a decision independently or with appropriate services . . . and, in making or revoking . . . [a] health-care decision, understands the nature and consequences of the decision, including the primary risks and benefits of the decision." 16 *Del. C.* § 2503.

The Act imposes a substantive limitation on a guardian's authority. A guardian may refuse to comply with, or revoke, an advance health-care directive

"only if the court appointing the guardian issues an order expressly permitting the acts taken by the guardian." 16 *Del. C.* § 2522(a). That requirement governs the scope of the guardian's power where the guardian seeks to act inconsistently with the individual's health-care instruction.

In conjunction with the adoption of the Act, this court amended Court of Chancery Rule 178-A to "remove outdated references, repealed by the Act, and clarify the powers of guardians on issues concerning life-sustaining treatment for a person with disabilities."[70] Rule 178-A(a) provides that a guardian "may not change a person with a disability's code status or direct medical providers to withhold or withdraw . . . mechanical ventilation . . . unless [(a)] . . . [a] medical provider confirms . . . a major reduction in health or functional ability from which the individual is not expected to recover," *or* (b) the guardian obtains prior court approval. Ct. Ch. R. 178-A(a).

Rule 178-A had the unintended effect of creating a conflict with the Act. Under the Act, a guardian seeking to revoke or not comply with a health care directive must obtain court approval, whereas Rule 178-A permits the guardian to

---

[70] *See* Press Release, Delaware Court of Chancery, *The Court of Chancery Amends and Adds New Rules Affecting the Magistrate Docket to Address the Incoming Title 16 Cases and Improve Guardianship Procedures* (Sept. 23, 2025).

do so either with court approval or upon a medical provider's confirmation that the individual has had a major reduction in health or functional ability from which the person is not expected to recover. This conflict between the Act and the Rule is easily resolved in favor of the Act.

Section 361(a) of Title 10 of the Delaware Code permits the court to adopt rules of practice and procedure "with respect to . . . proceedings in [this] Court." But Section 361(b) limits that rule-making authority, expressly providing that "[t]he [Court of Chancery] [R]ules shall not abridge, enlarge or modify any substantive right of any party." 10 *Del. C.* § 361(b); *see Nelson v. Frank E. Best Inc.*, 768 A.2d 473, 490 (Del. Ch. 2000) (observing that the court's rules may not "override . . . any statutory provision duly enacted by our General Assembly").

The Guardian proceeded under Court of Chancery Rule 178-A. The physicians' affidavits and testimony established that J.L.S. was ventilator-dependent, in shock requiring vasopressors, experiencing arrhythmia, and suffering worsening hypoxia due to heart failure despite diuretic therapy. The physicians opined that J.L.S. was not expected to recover and was unlikely to survive this hospitalization. That medical record satisfies the type of "major reduction in health or functional ability" contemplated by Rule 178-A(a)(1). But Section 2522(a) of the Act imposes a substantive limitation on a guardian's authority to disregard an

individual's health-care directive. Because that statutory requirement governs the scope of the guardian's authority, it controls. Accordingly, notwithstanding the medical evidence of irreversible decline, the Guardian must obtain court authorization before directing withdrawal of mechanical ventilation or otherwise acting inconsistently with J.L.S.'s health-care instruction.

## B.   The Governing Standard

When this court appoints a guardian, it entrusts the guardian to "engage in a fully-informed decision-making process" and to rely on appropriate medical and professional advice. *See In re A.R.*, 2025 WL 2017280, at *7 (Del. Ch. June 27, 2025) (quoting *In re M.G.*, 2022 WL 20470845, at *4 (Del. Ch. Jan. 31, 2022)). "This [c]ourt and any guardian are required to advance the best interest of the person with a disability." *Id.* (citing *Gordy*, 658 A.2d at 618). If the individual can express their wishes rationally, the court must consider them. *Id.*

The Act gives primacy to an individual's health-care instructions when made with capacity. 16 *Del. C.* §§ 2503−2504, 2507(c), 2515. If the record contains a later instruction made with capacity that has not been revoked under the Act, the court's task is correspondingly narrow. The court must determine whether the proposed course of action reflects the ward's wishes. *See L.M.R.*, 2008 WL 398999, at *3. "To ensure that the decision of the guardian[] to terminate life-sustaining

treatment truly represents the wishes of the ward, any decision of this [c]ourt that the ward would wish to refuse such treatment must be supported by evidence that is clear and convincing." *Id.* (citing *In re Tavel*, 661 A.2d 1061, 1070 (Del. 1995)).

Under Delaware law, clear and convincing evidence produces in the factfinder's mind an "abiding conviction" that the factual contention is "highly probable, reasonably certain, and free from serious doubt." *In re G.S.*, 2022 WL 20471650, at *3 (Del. Ch. July 1, 2022) (quoting *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002)). In this setting, "medical evidence is of significant importance." *Id.* (quoting *Brittingham v. Robertson*, 280 A.2d 741, 743 (Del. Ch. 1971)). Yet medical evidence does not displace the requirement that the court evaluate "all factors relevant to the ward's 'personal value system,' including prior statements relevant to the ward's current medical condition and 'all facets' of the personality of the ward." *L.M.R.*, 2008 WL 398999, at *3 (quoting *Tavel*, 661 A.2d at 1069).

Cases of this nature present the "weightiest questions . . . touching on the profound values of life, dignity, and family." *In re W.E.*, 2025 WL 3540216, at *1 (Del. Ch. Dec. 10, 2025). In addressing those questions, the court acts as a "conscientious steward for one who can no longer advocate for his own safety." *Id.* Where the record contains a valid, later health-care instruction made with capacity,

the substituted judgment inquiry does not permit the court to override that instruction

absent statutory grounds for invalidation or revocation.

### C.    J.L.S. Revoked the April 2024 DMOST

The Act presumes capacity unless rebutted.  16 *Del. C.* § 2504.  Under the

Act, health-care instructions, including those documented in medical records, may

be revoked.  Revocation may be effected "by any act . . . that clearly indicates"

intent, "including an oral statement to a health-care professional," so long as the

individual has capacity under the Act.  16 *Del. C.* § 2515(a)(1), (b).

These provisions are central to this case.  In April 2024, J.L.S. executed a

DMOST declining resuscitation, intubation, mechanical ventilation, or artificial

nutrition.  The contemporaneous palliative care notes reflect statements consistent

with that directive—namely that he was "ready to die when it is his time," did not

want aggressive or artificial measures to prolong life, and expressed distress with his

quality of life due to immobility and pain.  But the record does not end there.  On

October 25, 2024, during an intensive care unit admission for atrial tachycardia with

hypotension, J.L.S. changed his code status from DNR to full code.[71]  It is both

documented and undisputed that J.L.S. "had capacity to make the decision" at that

---

[71] Emergency Petition Ex. E.

time.[72]  The same record indicates that he was administered a total of 18 mg of adenosine that day, in three 6 mg doses.[73]

During the court's emergency hearing on February 16, 2026, Dr. S.N.M. opined that J.L.S.'s decision to elect full code likely occurred in the context of the adenosine administration—a medication that can temporarily halt the heart's electrical activity to reset abnormal cardiac rhythms.[74]  The suggestion here is that J.L.S. might have wanted only a temporary change in code status during his adenosine treatment.  But that suggestion is demonstrably weak.  Dr. S.N.M. did not have first-hand knowledge of J.L.S.'s reasoning in October 2024.  Rather, the physician's testimony was surmised from the medical records and the timing of the adenosine administration.  In fact, the contemporaneous record itself does not corroborate that rationale.  Indeed, October 25, 2024 was not the first time that J.L.S. received adenosine treatment.[75]  Physicians had treated J.L.S.'s supraventricular tachycardia with adenosine once before—on May 21, 2024, and at that time J.L.S. did not elect to change his code status.[76]  In short, Dr. S.N.M.'s observations do not

---

[72] *Id.*

[73] *Id.*

[74] *See* Hearing Judicial Action Form.

[75] Emergency Petition Ex. E.

[76] *Id.*

support the notion that J.L.S. intended only a temporary change in code status in October 2024 or that he lacked capacity at the time he decided to change his status to full code.

The Guardian did not seek a finding that the October 2024 full code instructions were invalid when made, nor did the Guardian present evidence rebutting the statutory presumption of capacity at that time. The Guardian also did not offer evidence undermining J.L.S.'s January 2026 statements reaffirming his desire to remain full code. Under the Act, if the October 2024 full code instruction was made with capacity, then the April 2024 DMOST was revoked to the extent it conflicted with the later full code instruction. 16 *Del. C.* §§ 2507(c), 2515(a)(1), (b).

### D. Whether the Court May Authorize Action Inconsistent with the Full Code Instruction

The Emergency Petition sought authority for the Guardian to direct withdrawal of mechanical ventilation and to direct that J.L.S. not be reintubated in the event he could not breathe independently.[77] That relief would have required the court to authorize an action inconsistent with J.L.S.'s recorded full code instruction. The dispositive question was therefore not whether withdrawal would have been medically appropriate or whether J.L.S.'s quality of life had deteriorated. The

---

[77] Emergency Petition ¶ 14.

question also was not whether he expressed reluctance in April 2024 to prolong life by artificial means. The controlling question presented in the Emergency Petition was whether the court may authorize the Guardian's representative to override J.L.S.'s later full code instruction on this record.

The October 25, 2024 medical record contains an express notation that J.L.S. "had capacity to make the decision" to change his code status to full code. Although witnesses offered testimony regarding what they thought might have led to the status change, the record does not document the reasoning behind J.L.S.'s decision to change his status. It reflects only that adenosine was administered, that the code status was changed, and that J.L.S. had capacity. Moreover, the record reflects a documented reaffirmation of full code status in January 2026 while J.L.S. was awake and oriented to person and place. The court did not hear testimony from R.M., who documented that reaffirmation. The record also does not establish that the Guardian's representative had a direct conversation with J.L.S. about code status when his condition began to deteriorate in January 2026.

The physicians' testimony regarding prognosis, tracheostomy, PEG placement, and likely outcomes underscored the gravity of the medical circumstances. But the Act does not permit a guardian or the court to disregard a valid health-care instruction solely because of a worsened prognosis. Nor does it

permit the court to substitute its own assessment of the medical prognosis for a health-care instruction made with capacity. *Severns* cautions that the court may not decide "life-and-death matters" without a record sufficient to support relief. 421 A.2d at 1349–50. *L.M.R.* emphasizes that clear and convincing evidence is required in these circumstances to ensure that a guardian's request "truly represents the wishes of the ward." 2008 WL 398999, at *3. And *W.E.* underscores that the court's role is that of a "conscientious steward for those who can no longer advocate for [their] own safety." 2025 WL 3540216, at *1.

The Guardian did not meet the clear and convincing evidentiary burden to justify authorizing action inconsistent with J.L.S.'s full code instructions reflected in the record. There is no evidence to support a finding that J.L.S. lacked capacity when he elected full code status in October 2024, and the Guardian has not sought such a finding. Consequently, the court did not find that the Guardian's request to withdraw life-sustaining treatment "represents the wishes of [J.L.S.]." *L.M.R.*, 2008 WL 398999, at *3.

## III. CONCLUSION

Therefore, the Emergency Petition is denied.

IT IS SO ORDERED.

Very truly yours,

*/s/ Paul A. Fioravanti, Jr.*

Vice Chancellor